**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
Northern Division**

| | | |
|---|---|---|
| GREAT LAKES EXPLORATION | ) | |
| GROUP LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:04-CV-375 |
| | ) | |
| The Unidentified, Wrecked and (For Salvage- | ) | HON. ROBERT HOLMES BELL |
| Right Purposes), Abandoned Sailing Vessel, etc. | ) | |
| Defendant, et al. | ) | |

## PLAINTIFF GREAT LAKES EXPLORATION'S BRIEF IN OPPOSITION TO INTERVENORS' MOTION TO DISMISS

### PRELIMINARY STATEMENT

Intervenors' Motion[1] presents the Court with two core issues: (1) whether, as the Motion

asserts, the Court "lacks subject matter jurisdiction" because "*any vessel described in the*

*complaint* belongs to the State of Michigan," Int Br at 1 (emphasis added), and "is, by the

operation of the ASA [Abandoned Shipwreck Act, 43 U.S.C. §2101 *et seq.*], the property of the

State of Michigan, not subject to maritime jurisdiction," Int Br at 9; (2) whether the Defendant

"belongs to the State of Michigan as a matter of the law of the United States, maritime law and

---

[1] Plaintiff regrets to advise the Court that, to date, the parties have been unable to resolve their differences amicably. As a result, the Court may be required to divert time and energy from its burdensome schedule into adjudicating these issues. Although Plaintiff believes that its legal position in this matter is clearly correct under well-established precedents, it nevertheless earnestly desires to foster a cooperative and amicable relationship with the State of Michigan. Plaintiff believes that the State's input and insights would enhance the exploration and protection of the Defendant shipwreck. Notwithstanding the need in this Brief to respond to at least some of the tactical jabs and pricks in the Intervenors' Motion to Dismiss, Plaintiff intends to continue its endeavors to develop a cooperative relationship with the State, and believes that this is a case where the Court's wisdom and guidance-- perhaps through mediation, or, as a final resort, through adjudication-- would serve the interest of the parties and, more importantly, the interests of the public and of future generations. A cooperative approach is particularly desirable because of the important opportunities presented by this project for public and private education. *See* Affidavit of Dr. Scott Demel (discussing educational mission of The Field Museum).

Dockets.Justia.com

the law of Michigan," Int Br at 16, and whether Intervenors lack the ability "commence an investigation into the facts".

In addressing these issues, Intervenors' Motion omits any discussion of the procedural steps involved in adjudicating a state's assertion of immunity and ownership under the Abandoned Shipwreck Act, state law, and the Eleventh Amendment. The Sixth Circuit's instruction on these procedural steps, by and large, disposes of the arguments asserted in Intervenors' Motion. *See Fairport International Exploration, Inc. v. The Shipwrecked Vessel, known as the Captain Lawrence*, 177 F.3d 491, 497-501 (6th Cir. 1999).[2] Contrary to the Motion's core premise, a state's claim of immunity and ownership may not rest on the mere constructive possession over the *res* purportedly flowing from state sovereignty over state lands, but instead requires that the state be in actual physical possession of the *res*. *See id*. at 497 n.3 (giving instructions on the application of *California v. Deep Sea Research, Inc.,* 523 U.S. 491(1998).[3] By Intervenors' own admission, Michigan lacks such actual possession.

While Intervenors' affidavit states in one breath that the Amended Complaint provides insufficient information to allow them to commence an investigation into the facts, Int Br at 3, it admits in the next breath that Intervenors have determined, based on the allegations in the

---

[2] As discussed further below, this is but one in a series of omissions or oversights in Intervenors' argument which might be considered troubling by those who regularly practice in the area of shipwreck law, but which would appear in the case of Intervenors simply to reflect a good faith—and entirely understandable—misapprehension of the complexities and subtleties of this highly-specialized, and sometimes even abstruse, area of jurisprudence. Given the heavy public responsibilities Intervenors must carry on their shoulders in a wide variety of fields, these omissions are thus treated below as good faith oversights simply illustrating the adage that no one (except this Court) can be an expert in all things.

[3] Viewed in this light, it is entirely understandable why the State would desire that Plaintiff be forced to publicly promulgate the exact location of the shipwreck site, since doing so would conveniently allow the State to then assert that it exercised "actual physical possession" of the wreck-- and thereby could circumvent the procedure for establishing immunity under *State of California v. Deep Sea Research*.

Amended Complaint, that Defendant is, as a matter of law, "the property of the State of Michigan." Int Br at 9.[4] While Intervenors assert that the description of the Defendant in the Amended Complaint is so broad as to include a veritable "inventory of ships that might satisfy the physical description of the original vessel," Int Br at 3, Intervenors are unable to provide the Court with the name of a single possible shipwreck fitting that description—other than a lone vessel of a foreign sovereign which, by the public declamations of the State's own Archaeologist, falls outside the purview of the Abandoned Shipwreck Act.

In sum, the Court is not impotent to adjudicate Intervenors' claims that the State owns Defendant. Under the very Sixth Circuit precedent invoked by the Intervenors, determination of rights in the Defendant falls squarely within the Court's jurisdiction.

## FACTS

Although the Plaintiff, of course, bears the burden of establishing jurisdiction, "[i]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). *See also Tornichio v. U.S.*, 263 F.Supp.2d 109, 1094 (N.D. Ohio 2002). Intervenors assert that, where a party, as here, desires to dispute the sufficiency of the pleadings but elects to assert facts outside the face of the pleading, the issue becomes whether the record contains a genuine issue of material fact. Int Br at 5-6.[5]

---

[4] Indeed, if the Intervenors had been unable to determine their interest in this proceeding, they would not have been permitted to intervene. *Compare* Fed. R. Civ. P. 24 (basis for intervention) *with* Int Br in Support of Mot To Intervene.

[5] While the record shows beyond cavil that there is a genuine issue of material fact, in compliance with his duty of candor to the Court, counsel for Plaintiff respectfully calls to the Court's attention to *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 2002). In any

Plaintiff's Verified Amended Complaint alleges that the case falls within the Court's admiralty and maritime jurisdiction, 28 U.S.C. §1333. (Am Compl ¶ 8). It notes that the Defendant is a wrecked and, for salvage-right purposes, abandoned sailing vessel, together with her tackle, apparel, appurtenances, cargo, etc. (*Id.* Caption). It identifies the location of the wreck within a circle having a radius of 3.5 statute miles, whose center point is at coordinates 45° 32.8′ North latitude and 86° 41.5′ West longitude. (*Id.*). It alleges that the vessel was owned by a foreign research expedition operating with the authority of, and possibly under the auspices and/or control of, a foreign sovereign until it became wrecked, lost and abandoned (*id.* ¶ 5), and that Plaintiff is conducting its current analysis, investigation and operations with the express written permission of the entity which it believes is or may be the legal successor-in-interest to the original owner. (*Id.* ¶ 4). The verified Amended Complaint further alleges that the Defendant's physical characteristics at the time of sinking:

> (a) power system: sail(s) and oars; (b) hull construction: wooden; (c) hull dimensions: (1) length- approximately 40'-60'; (2) breadth- approximately10'-22'; (d) method of construction: hand; (e) approximate crew size: five; (f) approximate tonnage: 45 tons (or tuns); (e) time of construction: believed to be of significant age, prior to 20th century.

(*Id.* ¶ 6)

The Amended Complaint alleges that "the Defendant *res* is unique and there are no other shipwrecks known or believed to be within the geographic area identified above, or at or near the vicinity thereof, having the foregoing characteristics." (*Id.* ¶ 7). It alleges the absence of salvage efforts by the original owners. (*Id.* ¶ 12). It alleges that Plaintiff is actively and successfully engaged in the process of reducing the shipwreck to its exclusive custody, control, possession, and dominion, and asserts Plaintiff's salvage rights. (*Id.* ¶ 14).

---

event, Plaintiff believes that it prevails under any standard in light of the procedural strictures set forth in *Fairport International Exploration, Inc. v. The Shipwrecked Vessel,*177 F.3d at 498.

Defendant's Motion to Dismiss relies on affidavits from two state employees. Neither of these employees has personally observed or dived on the Defendant.[6] According to the affidavit of Thomas P. Graf: (1) he has drawn circles on a map indicating that the *Captain Lawrence*[7] is also located somewhere within the general coordinates where the Defendant is located; (2) Michigan claims sovereignty over its bottomlands; and (3) Great Lakes Exploration and the Field Museum have not requested a state excavation permit. According to the affidavit of the second state employee, Wayne Lusardi, (1) the "discovery of a 45 ton, 40-60 foot long, wooden, hand-build sailing vessel with a beam of 10-22 feet, and a crew of five, lost and abandoned near Poverty Island prior to the 20th century would, without question, be a significant find," (2) "Small sailing craft are particularly rare in the archaeological record of the Great Lakes," (3) the allegation "that the original owners never salvaged the wreck indicates that it is truly an abandoned vessel and increases the probability of material remains," (4) "Even if broken apart and distributed widely across the lake bottom, shipwrecks can be valuable in our understanding of [the] past", (5) if the defendant can be linked to a particular person or expedition of historical significance, it would greatly contribute to the maritime heritage of the State of Michigan, the Great Lakes region, the nation as a whole, and transcending national boundaries, (6) without the specific location and condition of a vessel, "it is difficult accurately to determine [its] historical

---

[6] On their face, the State's affidavits fail to comply with Fed. R. Civ. P. 56(e) (affidavits must be made on personal knowledge, setting forth facts admissible in evidence and showing affiant's testimonial competence). The affidavits go so far as to include not only rank speculation but even legal opinions (*e.g.* Affidavit of Wayne Lusardi, ¶10 (opinion on legal requirements of MCL 324.76107), ¶4 (giving legal opinion that the fact that "the original owners never salvaged the wreck indicates that it is truly an abandoned vessel")). While Intervenor's affidavits should thus be rejected on purely procedural grounds, and Plaintiff accordingly hereby moves that they be stricken, this Brief in Opposition nevertheless addresses them *arguendo* on their merits for the purpose of demonstrating beyond cavil that the Motion to Dismiss is not well-founded.

[7] Intervenors' Motion seems to imply that the present proceeding is actually a sham directed at seizing the *Captain Lawrence*. See Int Br at 3-4.

significance", (7) on June 22, 2004, Steve Libert provided Mr. Lusardi several "dimly lit" digital photos from a wreck "consistent with the description of the alleged vessel in the amended complaint," (8) the "dimly lit" photos "portray an isolated wooden artifact apparently less than ten square feet in area," and from the photo "it appears that the artifact has been driven into the bottomland with sufficient force to be sustained by the soil in an upright position and affixed so that it would be necessary to use mechanical devices to reveal the base of the artifact," (9) he "cannot reasonably initiate a search" for the object portrayed in the "dimly lit" photograph in his possession "nor for any other wrecked wooden sailing vessel" based solely "only on the description as provided in the Amended Complaint," (10) Great Lakes Exploration has not requested a state permit.

Great Lakes Exploration has filed affidavits of individuals who have personally dived on, and observed, the wreck site. The affidavit of Dr. Scott Demel, an archaeologist with the Field Museum of Chicago, sets forth Dr. Demel's expert qualifications in the field of archaeology, with special expertise in the archaeology of the western Great Lakes region. Dr. Demel has applied his expert training and abilities in the field of archaeology in studying and analyzing the Defendant. He has observed that the project has applied good and standard methods of historical and archaeological study to the shipwreck site-- with a view to protecting the scientific, historic and underwater archaeological values of the site, consistent with the Field Museum's stated mission of advancing public and private education both in the Midwestern United States and internationally. Good and standard underwater archaeological practices in the Great Lakes Region dictate that to the extent practicable, the entire debris field for shipwrecks having historic value be scientifically mapped. Such practices also dictate that to the extent practicable, a photo

mosaic record be made for the entire debris field for shipwrecks having historic value, and that the entire debris field be scientifically mapped.

Dr. Demel's affidavit further states that good and standard underwater archaeological practices in the Great Lakes region dictate that to the extent practicable, all artifacts from shipwrecks having historic value be maintained under unified management to permit scientific and historic research. Permitting dispersion of artifacts from shipwrecks having historic value is typically inconsistent with good and standard underwater archaeological practices. Permitting looting of the underwater sites by relic hunters is also inconsistent with good and standard underwater archaeological practices.

Dr. Demel's affidavit observes that failure to protect underwater sites may result in the irreparable loss of important scientific and/or historical information. Prematurely disclosing site conditions, sea bottom conditions and identification of such shipwrecks may likewise increase the risk of looting and/or destruction of such shipwrecks by relic hunters.

Dr. Demel's affidavit notes that improvidently using mechanical devices for underwater excavation may, in the case of archaeological sites, result in substantial loss of information and/or irreparable harm to the site conditions. In contrast to Mr. Lusardi, Dr. Demel would not recommend the use of mechanical devices for "excavating" the shipwreck site and is aware of no proposal for the use of such mechanical devices.

In the sealed portion of his Affidavit, Dr. Demel discusses at length the specific facts pertaining to the identification of the Defendant shipwreck and the basis for that analysis. Dr. Demel notes that the subject of the project is not the *Captain Lawrence*, and that if it were, the Field Museum would not be involved in the project. He describes why good archaeological practices indicate that the geographic area encompassed by the Defendant is significant,

particularly in light of its high energy conditions and relevant historic record. Dr. Demel explains why it is common for debris fields of this kind to spread over time, why there are numerous anomalies in a comparatively large area which need to be documented and investigated as a part of a sound scientific investigation of the shipwreck site, and why premature public disclosures, prior to implementation of legal protection against such destruction, would subject the site to risk of irreparable harm, significantly increasing the possibility of looting and/or destruction of the shipwreck by relic hunters, and thereby resulting in an irreparable loss of information and heritage.

The second affidavit, by Steven Libert, sets forth Mr. Libert's expertise in diving and underwater exploration. The Affidavit describes the project's involvement of scholars and experts in the field of underwater archaeology and exploration, and the commitment of Great Lakes Exploration and the Field Museum to protecting the scientific, historic and archaeological values of the shipwreck. The Affidavit describes mistaken factual assumptions underlying the speculation set forth in Intervenors' affidavits. The Affidavit states that Great Lakes Exploration has invited the State of Michigan's representatives to the wreck site, and that the State has not accepted the invitation. It notes that the invitation remains open, and that Great Lakes Exploration and the Field Museum would welcome the State's suggestions and insights. The Affidavit explains the error in Intervenors' assertion that the State of Michigan is incapable of commencing an investigation into the facts, and explains that with respect to investigation of an 38.5 square mile area of Lake Michigan, having a maximum depth of less than 120', there are numerous, well-known, well-tested, well-established, commercially-available methods and technologies for conducting such investigations, including side-scan sonar, sub-bottom profiling, magnetometer investigation, visual investigation, probability analysis, and numerous other

techniques.  Such methods and technologies have now been available for over two generations.  The Affidavit notes that it is well-known that the depths in the area are comparatively shallow, and are well within the capability of traditional scuba gear.

The Affidavit notes that the description of the location and wreck site is based on the functional nature of the shipwreck, the sea conditions in the area (which tend to disperse artifacts over a wide area), the need to preserve the unity of artifacts associated with the shipwreck, and the importance of protecting the shipwreck from risk of looting or damage by relic hunters.  It describes how Great Lakes Exploration is in the process of creating a photomosaic and mapping the entire debris field for the shipwreck.  It describes how premature disclosure of the pinpoint location of the main body of the wreck publicly, of site conditions, and of the other circumstances identified in the sealed portion of the Affidavit would increase the risk of looting and/or destruction of the Defendant.

In the sealed portion of his affidavit, Mr. Libert discusses the protocol with the foreign sovereign believed to be the owner of the Defendant.  The Affidavit sets forth the Defendant's history and attributes, together with the role of the foreign sovereign and its Ministry of Culture.  He describes the reasons underlying Great Lakes Exploration's efforts to maintain confidentiality of the exact location of the Defendant until legal protections are in place, to prevent looting of the site and to honor the understanding of the foreign sovereign.  The Affidavit notes that there are no other shipwrecks fitting the description set forth in the Amended Complaint; points out that the Defendant is clearly not the *Captain Lawrence*; agrees with Mr. Lusardi's statement that "[s]mall sailing craft are particularly rare in the archaeological record of the Great Lakes"; and that there is no other vessel with satisfying the criteria set forth in the Amended Complaint known or believed to have sunk in the area other than the Defendant.  The Affidavit also agrees

with Mr. Lusardi's affidavit that "[e]ven if broken apart and distributed widely across the lake bottom, shipwrecks can be valuable in our understanding of past technologies, trade patterns and commerce, as well as social, political, and religious realms," and notes that, in addition to confidentiality, this is one of the reasons why the Defendant encompasses a significant geographic area, thereby allowing for systematic mapping, study, and, in the future, exhibition and laboratory research by qualified scholars and educators. The Affidavit notes that as a result of the high-energy characteristics of the sea in the area, together with the other circumstances of the wreck, that it is likely that bits and parts of the wreck have significantly spread out, and that these should be documented and analyzed as a part of a sound scientific investigation of the shipwreck site in order to avoid the irreparable loss of information.

The Affidavit further notes that Mr. Lusardi's information about the wreck is incomplete and outdated. It notes that the actual date of the photographs mentioned in Mr. Lusardi's affidavit was from an at-sea expedition over two years ago. The Affidavit explains why Mr. Lusardi's speculation based on the outdated photographs is not consistent with the facts personally observed at the shipwreck site. The Affidavit accepts that Mr. Lusardi seems to believe that in the 2002 photographs that the object depicted was driven "with sufficient force" to embed it into the seabed, Mr. Lusardi seems to have overlooked the well-known nature of the sea conditions in the area, including the fact that vessels in the area can be covered, in whole or in part, by significant sedimentation in the area over a period of time. Because of the geologic nature of the area, the bottom is highly susceptible to dispersion and scatter, and the bottom sedimentation is amenable for digging by hand, which, though more painstaking than the mechanical means suggested by Mr. Lusardi, tends to be a better method for protecting against loss of information about the shipwreck. Mr. Lusardi's speculation that mechanical devices would be required to

excavate the shipwreck is not consistent with the facts personally observed by Mr. Libert.   The area is not one characterized by coralline or similar formations which may lead to embedding shipwrecks (as may sometimes be typical in parts of the Caribbean Sea and other bodies of water located near the Equator), and, instead, the conditions indicate that that gradual sedimentation accounts for the condition.   As for lifting capabilities, there are numerous methods and techniques in place which (if required) would be of a purely passive nature, such diver transport, air bags, natural buoyancy, and other passive techniques.  Based on its current information, Great Lakes Exploration does not believe that mechanical devices are either needed or appropriate for the shipwreck site, and it is concerned that using mechanical devices could potentially result in loss of information and/or irreparable harm to the wreck site.  Because the wreck site is located in a shoaled area, it is not in a shipping channel and no commercial navigation or fishing activities occur in the area.

## ARGUMENT

I.   *CALIFORNIA V. DEEP SEA RESEARCH* AND ITS PROGENY DISPOSE OF THE MOTION'S ATTACK ON THE COURT'S SUBJECT MATTER JURISDICTION

As a threshold matter, the Court must first consider the Motion's attack on subject matter jurisdiction.[8]  If the Motion is correct in contending the Court lacks admiralty jurisdiction to consider Plaintiff's claims, then Court is obliged to dismiss without proceeding further in the matter.

Fortunately, the Supreme Court has clearly addressed the premise of Intervenors' attack on jurisdiction, and has rejected it.  In *California v. Deep Sea Research, Inc.,* 523 U.S. 491 (1998),

---

[8] Although Intervenors frame this attack in four separate sections (contentions II-V), their arguments rest on the unitary premise that the *in rem* Defendant is within their ownership and possession by virtue of the Abandoned Shipwreck Act and Michigan state law.

the Court considered various claims of the State of California to a defendant *res*. As here, the explorer had invoked federal admiralty jurisdiction, and the State of California had moved to dismiss based on its rights "to the Brother Jonathan under federal and state law." In rejecting the State's motion to dismiss and upholding admiralty jurisdiction, the Court concluded that "the Eleventh Amendment does not bar the jurisdiction of a federal court over an *in rem* admiralty action where the *res* is not within the State's possession." 523 U.S. at 494-95.[9]

Intervenors' Motion would nevertheless like the Court to believe that *California v. Deep Sea Research* and related cases actually support their attack on subject matter jurisdiction because, according to Intervenors, "Michigan has possession of the subject of this action…." Int Br at 15, *citing, inter alia, California Deep Sea Research*. This argument reflects another of Intervenors' good faith misunderstandings of admiralty law, since *California v. Deep Sea Research* expressly rejects the notion that such "constructive possession" creates an impediment to the federal judiciary's admiralty and maritime jurisdiction over shipwrecks on state bottomlands. *California v. Deep Sea Research, Inc.*, 523 U.S. at 491 (required possession is "'an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication.'").

And, of course, the Court of Appeals for the Sixth Circuit has similarly instructed that the "constructive possession" claimed by the State of Michigan is not sufficient:

> *Deep Sea Research* drew upon Civil War-era precedent to define "possession," for purposes of the ASA, as actual (not constructive) possession. *See Deep Sea Research*, 118 S. Ct. at 1472-73; *see also The Davis*, 77 U.S. (10 Wall.) 15, 21 (1869) ("The possession which would do this must be an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication."). When the district courts ruled in both the *Brother Jonathan and Fairport I*, neither State had raised the contested ships nor

---

[9] This procedure is consistent with the well-established principle that where jurisdictional issues are intertwined with the merits, the Court should proceed to trial on the merits.

registered them as historic sites. Nor has Michigan brought before the district court items
recovered from the *Captain Lawrence*.

*Fairport International Exploration, Inc. v. The Shipwrecked Vessel*, 177 F.3d at 497 n.3.

In *Fairport International Exploration, Inc. v. The Shipwrecked Vessel*, the Court of Appeals
described in systematic detail the procedure for considering *in rem* actions in light of *California
v. Deep Sea Research*.  The Court of Appeals gave unambiguous guidance on the nature and
effect of *California v. Deep Sea Research*, noting that "where a State does not possess the vessel
that is the subject of an in rem admiralty action, the Eleventh Amendment does not bar federal
jurisdiction over the vessel and, therefore, federal courts may adjudicate competing claims to the
shipwrecked vessel."  *Fairport International Exploration, Inc. v. The Shipwrecked Vessel*, 177
F.3d at  496.

In light of the instruction in *California v. Deep Sea Research*, the Court of Appeals
characterized as a "red herring" the arguments raised by the State of Michigan—which are now
urged, once again, in Intervenors' instant Motion to Dismiss:

> The Supreme Court's recent decision in *Deep Sea Research* rejects this approach. That
> opinion definitively instructs us that, if a State does not possess a shipwreck, the Eleventh
> Amendment does not prevent a federal court from entertaining claims under the ASA to
> the shipwreck. *See Deep Sea Research*, 118 S. Ct. at 1473. The Court explicitly
> distinguished past cases on this ground. *See, e.g., id.* at 1471 ("In this case, unlike in
> *Treasure Salvors*, DSR asserts rights to a res that is not in the possession of the State.")
> In the *Brother Jonathan* dispute, as in *Fairport I*, the district court believed that the
> Eleventh Amendment barred federal jurisdiction over shipwrecks claimed by States
> through the ASA's transfer of title. The Supreme Court vacated the *Brother Jonathan*
> opinion and remanded because the Court found that this evaluation of abandonment "was
> necessarily influenced by the [mistaken] assumption that the Eleventh Amendment was
> relevant to the courts' inquiry." *Deep Sea Research*, 118 S. Ct. at 1473. It continued: "In
> light of our ruling that the Eleventh Amendment does not bar complete adjudication of
> the competing claims to the *Brother Jonathan* in federal court, the application of the ASA
> must be reevaluated." *Ibid*. This implies that, because no jurisdictional barrier exists, the
> district court should conduct only one "abandonment" inquiry, and that that inquiry does
> not ask a preliminary jurisdictional question, but rather resolves whether Behrens
> abandoned the ship, and thus whether the ASA transfers title to Michigan. ****The
> Supreme Court has clarified that, because Michigan did not possess the res, the district

court should not have undertaken a preliminary Eleventh Amendment inquiry. Rather, Michigan's claim under the ASA should receive an evaluation consistent with the requirements of the ASA and maritime law. The Supreme Court remanded the *Brother Jonathan* case "[i]n light of [the Court's] ruling that the Eleventh Amendment does not bar *complete adjudication* of the competing claims to the *Brother Jonathan* in federal court . . . ." *Ibid*. (emphasis added). *Thus, we remand this case to the district court for complete adjudication of the competing claims to the Captain Lawrence*. We write to guide the district court in its consideration of two issues: the means of proving abandonment, and the burden of proof placed upon Michigan.

*Fairport International Exploration, Inc. v. The Shipwrecked Vessel*, 177 F.3d at 497-98.[10] In sum, given the State of Michigan's lack of actual possession of the Defendant, the Court is required to deny the motion to dismiss and proceed with a trial on the merits.

II. **INTERVENORS HAVE FAILED TO MEET THEIR BURDEN OF PROVING THEIR PURPORTED OWNERSHIP OF THE DEFENDANT AND ARE ABLE TO "COMMENCE" AN INVESTIGATION.**

Intervenors' Motion elects to invoke the two supporting affidavits for the proposition that there is no genuine issue of material fact as to their claim that they are the owners of the Defendant, and that "it is impossible to inspect the supposed wreck". Int Br at 3, 5-6. In making this claim, the Motion again overlooks the allocation of the burden of proof established in *California v. Deep Sea Research*.

In applying that decision, the Sixth Circuit has instructed that the burden of proof lies with a State asserting a claim under the Abandoned Shipwreck Act:

The district court in Fairport I required only that Michigan establish a colorable claim to the shipwreck. The court permitted Michigan to prove by a preponderance of the evidence that Behrens abandoned the *Captain Lawrence. See Fairport I*, 913 F. Supp. at 559. The Supreme Court disapproved of a similar threshold inquiry by the *Brother Jonathan* district court, holding that federal courts may engage in "complete adjudication of the competing claims" under the ASA. *Deep Sea Research*, 118 S. Ct. at 1473. When the district court revisits this case on remand, it will not conduct a threshold inquiry to

_____

[10] While the Court of Appeals recognized that abandonment of private vessels may be proved by circumstantial evidence, it distinguished sovereign vessels. *Fairport International Exploration, Inc. v. The Shipwrecked Vessel,* 177 F.3d at 500.

determine whether Michigan has a colorable claim under the ASA. Instead, it will decide whether Behrens abandoned the shipwreck; if he did, the ASA vests title in Michigan.

*Fairport International Exploration, Inc. v. The Shipwrecked Vessel,* 177 F.3d at 500.  The Court of Appeals has further instructed that the State must carry its burden of proof by "clear and convincing evidence":

> The uniform rule in admiralty law is that a finding of abandonment requires proof by clear and convincing evidence.**** On remand, the district court will decide whether the ASA applies, not whether the Eleventh Amendment bars the action. The court should consider whether Michigan can prove that it owns the shipwreck-that is, whether clear and convincing evidence shows that Behrens abandoned the *Captain Lawrence.*

177 F.3d at 501.   Intervenors have failed to carry their burden of proof by clear and convincing evidence, let alone demonstrated the absence of a genuine issue of material fact.

Still, Intervenors imply that Amended Complaint's allegation that the "vessel" was "abandoned for salvage-right purposes" and was not salvaged by the original owner is the equivalent of an "abandonment" of the "shipwreck" for purposes of the Abandoned Shipwreck Act. *See* Int Br at 7.[11]   This, too, reflects a further, albeit entirely understandable, misapprehension of the complexities of admiralty law. In the context of a salvor's claim for salvage rights, "abandonment" of a vessel occurs when the master of the vessel terminates the voyage and orders the crew to abandon ship, thereby terminating the contract of carriage and discharging crew members (who thereafter qualify as "volunteers" and, as such, "will be entitled to claim a reward for salvage services" rendered in rescuing the vessel from a marine peril). Steel & Rose, *Kennedy's Law of Salvage* §§473, 1088 (5th ed.).   Thus, "[t]he term

---

[11] The Amended Complaint alleges that the Defendant is abandoned "[f]or salvage-Right Purposes" and "for purposes of Plaintiff's rights of salvage" (*Compare* Am. Compl., Caption, *with* Am. Compl. ¶13.   The Amended Complaint further states that "Plaintiff is conducting its current analysis, investigation and operations with the express written permission of the entity which it believes is or may be the legal successor-in-interest to the original owner." Am. Compl. ¶ 4.   By definition, since the original owner's successor has given permission, the vessel is not abandoned.

'abandonment' in salvage law means that the owner has lost the power to prevent salvage," not that the owner has lost "title" to the property. Schoenbaum, *Admiralty and Maritime Law* 851 (3d ed. 2001). "Should a vessel be abandoned without hope of recovery or return, the right of property still remains in her owner." 3A *Benedict On Admiralty* §150 (2003), *and cases cited therein*.[12] By its express terms (for obvious reasons under the Fifth Amendment's "takings" clause) the Abandoned Shipwreck Act covers only abandoned shipwrecks "to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101(b).[13]

The premise of the Intervenors' Motion, that the State of Michigan is the owner of *all* shipwrecked vessels on its bottomlands, *see* Int Br at 2, reflects another good faith misapprehension of admiralty law and the Abandoned Shipwreck Act. While it is true that Michigan has title to some vessels under the Act, it is equally clear that the State lacks title to others—including sovereign vessels of the United States and foreign sovereigns. For example, it is well-established under international maritime law that sovereign property owned or controlled by a foreign sovereign remains vested in that sovereign, and does not pass to another, absent the sovereign's express agreement. *See, e.g., Seahunt v. Kingdom of Spain,* 221 F. 3d 634 (4th Cir.

---

[12] *See* 3A *Benedict On Admiralty* §134 n.6, §158. *See also* Abandoned Shipwreck Act Guidelines, 55 FR 5011 Part I – Definitions ("Abandoned shipwreck means any shipwreck to which title voluntarily has been given up by the owner with the intent of never claiming any right or interest in the future and without vesting ownership in any person.**** Although a sunken warship or other vessel entitled to sovereign immunity often appears to have been abandoned by the flag nation, regardless of its location, it remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party.")

[13] Little need be said about the State's "embeddedness" claim, which is clearly based on second-hand speculation and without merit. *See* Affidavit Dr. Scott Demel; Affidavit of Steve Libert. *See also* Abandoned Shipwreck Act Guidelines, 55 FR 5011 Part I – Definitions (items embedded where mechanical "tools of excavation" required to recover them).

2000).[14]  *In Seahunt,* the U.S. Court of Appeals for the Fourth Circuit considered a claim by the Commonwealth of Virginia, among others, that it was the owner of Spanish vessels on its bottom land.  The Court of Appeals rejected this claim, noting that:

> Applying the express abandonment standard to sovereign vessels also respects the legitimate interests of the executive branch.  While the ASA confers title to abandoned shipwrecks to the states, it does not vitiate important national interests or undermine the well-established prerogatives of sovereign nations.

221 F.3d at 643.

Under the Abandoned Shipwreck Act, as well as maritime and international law, property of a foreign sovereign thus "remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party." 55 Fed. Reg. 50116, 50121 (1990).  The principle that sovereign vessels must be treated differently from privately owned ones also finds support in the legislative history of the Abandoned Shipwreck Act. *See, e.g., Sea Hunt*, 221 F.3d at 641 ("The House Report incorporates a State Department letter, which states, "the U.S. only abandons its sovereignty over, and title to, sunken U.S. warships by affirmative act; mere passage of time or lack of positive assertions of right are insufficient to establish such abandonment." H.R. Rep. No. 100-514(II), at 13 (1988), reprinted in 1988 U.S.C.C.A.N. at 381. The implications of this for other sovereign vessels is also underscored: '[T]he same presumption against abandonment will be accorded vessels within the U.S. territorial sea that, at the time of their sinking, were on the non-commercial service of another State.' Id." *See also Fairport International Exploration, Inc. v. The Shipwrecked Vessel*, 177 F.3d at 500 (distinguishing sovereign vessels from privately-owned vessels).  In sum, contrary to the premise of Intervenors' Motion, the State of Michigan has

---

[14] Conversely, it is, of course, equally well-established in admiralty law that, absent objection of the sovereign, sovereign property may become subject to salvage, and that a sovereign may expressly consent to salvage of its property.

carried its burden of proving by "clear and convincing evidence" that the Defendant "belongs" to the State of Michigan."[15]

Intervenors' Motion also fails to prove their assertion that they have found it "impossible to inspect" the wreck. Int Br at 3. (The test, of course, is not whether Intervenors can "inspect" the wreck, but instead whether they can "*commence* an investigation of the facts and …frame a responsive pleading." Fed. R. Civ. P. Suppl. E(2) (emphasis added)).[16] During the course of the project, Intervenors have been invited to join Great Lakes Exploration and the Field Museum in exploring the wreck, and they continue to be welcome to do so.[17] Both would highly value the State of Michigan's participation, insights, and involvement in their on-going analysis of the shipwreck. Affidavit of Dr. Scott Demel; Affidavit of Steven Libert.[18] In sum, it is clear that

---

[15] *See* Affidavit of Scott Demel; Affidavit of Steven Libert; Am Compl ¶ 5.

[16] In characterizing salvage value as "$35,000,000",  Int Br at 4,  Intervenors' Motion omits the actual language of the salvage *ad damnum*, which requests a salvage award of "$35,000,000 *or such amount or nature as may be determined by this Court under the law of salvage* or any other applicable law" (emphasis added).  As with Intervenors' other misapprehensions, Great Lakes Exploration does not consider this omission to signal any effort by Intervenors to be less than candid with the Court, but instead simply their lack of experience in understanding the functional nature of *ad damnum* clauses in salvage practice.

[17] The only conditions to this invitation are, and have been, that the State agree to protection of the confidentiality of the location—consistently with federal and state laws regarding confidentiality—and agree not to claim that by virtue of visiting the site that the State has acquired "actual possession" or other rights of a discoverer.

[18] Intervenor's motion repeatedly attempts to create doubt about Mr. Libert's motives, and to suggest that he is hostile to the public interest. *See, e.g.* Int Br at 3 ("Mr. Libert admits that the Captain Lawrence has obsessed him due to his belief that it is a ship of gold."); Int Br at 4, n. 1 ("The requested salvage award suggests that Mr. Libert, who verified the Amended Complaint for Plaintiff, still has gold in mind."). Such argument by innuendo requires little response. It cannot obscure the fact that both the Field Museum and the foreign sovereign have chosen to associate themselves with Mr. Libert in this project. Their motives, and their commitment to the public interest in proceeding with the project, cannot be impugned. Mr. Libert hopes that the State of Michigan will soon see fit to join them in proceeding amicably with this project.

Intervenors have had more than ample opportunity to commence an investigation of the facts, and will continue to have that opportunity in the future.[19]

Intervenors are perfectly well aware of the crux of this case. The issue for trial, quite simply, is whether the vessel is abandoned. Under the instruction of *California v. Deep Sea Research* and *Fairport International Exploration, Inc. v. The Shipwrecked Vessel,* Intervenors may not rest on a mere "colorable claim," and the Court should deny the Motion and proceed with pre-trial procedures and merits discovery for conducting a trial on the merits addressing that issue. 177 F.3d at 498.

---

[19] Even assuming hypothetically, for the sake of argument, that Great Lakes Exploration and the Field Museum had not invited the Intervenors to investigate the site with them, it is well-known to every authority in the field of underwater exploration that the area is "tiny" by modern technological standards. For the State of Michigan to suggest that the State, with its inherent taxing power and other resources as a sovereign, cannot conduct an investigation of an area of 38.5 square miles in Lake Michigan, when privately-funded groups who receive not even a penny of taxpayer support have successfully conducted investigations in areas over 20 times that size, at depths over 80 times greater, is inconsistent with the facts and nature of underwater investigations, *see* Affidavit of Steve Libert, and seems similarly incongruous in light of the Guidelines to the Abandoned Shipwreck Act. *See* Abandoned Shipwreck Act Guidelines, 55 FR 5011, Part II – Guidelines D4 (describing the host of techniques available to States for investigating sites, including "magnetometers, side-scan sonar, subbottom profilers and remotely operated vehicles.") Moreover, since passage of the Abandoned Shipwreck Act in 1988, the State of Michigan has had "the responsibility for the management" of certain resources in State waters" including "abandoned shipwrecks". 43 U.S.C § 2101. Consistent with the principle that a manager inherently has the responsibility for inventorying the property which it manages, the Guidelines set forth detailed management actions which were to be taken in discharging this management responsibility, including the preparation of a comprehensive inventory of shipwrecks under state management. *See* Abandoned Shipwreck Act Guidelines, 55 FR 5011 Part II – Guidelines D1. It is presumed that the responsible state officials have faithfully and properly discharged their duty. It is therefore unnecessary to mention the obvious irony in the Motion's "description" argument, when viewed in light of the express requirements of the Abandoned Shipwreck Act. When, over 15 years ago, the United States transferred to the "State in or on whose submerged lands" shipwrecks covered by the Act were located, 43 U.S.C. § 2105 (c), the Act also required that "As to "any shipwreck to which title is asserted under this section," the "*public shall be given adequate notice of the location*". 43 U.S.C. 2105 (b) (emphasis added). Neither the United States nor the State of Michigan has ever given such any "notice of the location" of a shipwreck fitting the description of the Defendant anywhere in the State of Michigan, whatsoever, let alone notice of such a shipwreck within the location set forth in the Amended Complaint.

While Intervenors seem somewhat mystified by the provisions of Fed. R. Civ. P. Supplemental Rule E(2) that a complaint should be sufficient to allow a party to commence an investigation and frame a responsive pleading, there is nothing magical or abstruse about that rule. Current salvage pleading rule finds its origins, of course, in Rule 19 of the 1844 Admiralty Rules (which later became Rule 18 of the 1920 General Admiralty Rules), the purpose of which was at the time of those rules—as today in its modern-day embodiment—simply to ensure that potential claimants had constructive notice that they should make a claim, if they chose.[20] Thus, as to admiralty claims:

> The particularity requirement of Rule E does not intend to change the pleading liberality traditional to admiralty. *It is only necessary that the facts must be sufficient to set forth a cause of action and the basis for the cause of action*.

4 *Benedict On Admiralty* §3.02[D][2] (2003) (emphasis added).

The Amended Complaint goes well beyond the pleading forms long-accepted in admiralty practice and procedure. *See, e.g.* 4 *Benedict On Admiralty – Forms*. Although Intervenors seem to think that admiralty law may be unfair to potential claimants in not requiring publication of a pinpoint location or an exact description of the "existing condition" of the property, it is not: under centuries-old admiralty principles, any person claiming an interest in maritime property—having chosen to enjoy the benefits of using the public seas for his own purposes— has a continuing duty to keep track of his property, which includes a duty to keep himself

---

[20]It is apparent that Intervenors may be unaware that because of the progressive and less rigid nature of admiralty practice and procedure, admiralty overcame the confines of ritualistic forms of pleading centuries before the common law, focusing instead on the functional goal of notice pleading from its very incipiency. In fact, even outside of the admiralty context, several authorities have indicated that alleged pleading defects in an *in rem* complaint may be cured not only by amendment but also by appropriate affidavit. *See, e.g., U.S. v. All Right, Title and Interest In Real Property and Appurtenances Known As 288-290 North Street*, 743 F.Supp. 1068, 1074 (S.D.N.Y. 1990).)

informed of the nature and location of such property.  *See generally The Mary*, 13 U.S. (9

Cranch) 126, 141 (1814); *Thorsteinsson v. M/V Draugon,* 891 F.2d 1547, 1553 (11th Cir. 1990).[21]

---

[21] Intervenors' Motion cites  *Dluhos v. The Floating and Abandoned Vessel, Known as*
*"New York,"* 162 F.3d 63 (2d Cir. 1998) (which affirmed a magistrate judge's dismissal of the
case on the basis of the plaintiff's failure to comply with the "condition of arrest" requiring
posting of a $5,000 bond) but omits to mention that the Court of Appeals actually upheld the
practice of exercising constructive jurisdiction over shipwrecks.  In this regard, Intervenors seem
to have similar misapprehensions regarding the procedures for an admiralty "arrest" over a
shipwreck (which, of course, differs dramatically from an arrest of a live ship). By virtue of
simply having rendered salvage service, the salvor's rights to continue its efforts spring into
existence from the date of its efforts as an inchoate property right, and cannot be taken or
displaced by anyone.  3A *Benedict On Admiralty* §151, *and cases cited therein.  See, e.g.*
*Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560 (5th
Cir. 1981).  With respect to protection of the salvor's on-going right to continue its salvage
efforts, the admiralty court executes exercises not actual, but instead "constructive*" in rem*
jurisdiction, and, of course, the "arrest" procedure is fashioned accordingly.  *See, e.g. R.M.S.*
*Titanic, Inc. v. The Wrecked and Abandoned  R.M.S. TITANIC*,  286 F.3d. 194, 206 (4th Cir.
2002).  As Intervenors may not be aware, the Court in shipwreck cases typically issues a warrant
for the "arrest" of a physical part of the wreck (an "artifact"), and the salvor brings the item to
the marshal for execution; based on this "arrest," the Court exercises constructive jurisdiction
over the entire shipwreck.  *See, e.g. R.M.S. Titanic, Inc. v. The Wrecked and Abandoned  R.M.S.*
*TITANIC*, 171 F.3d. 943, 964 (4th Cir. 1999), *cert. denied*, 528 U.S. 825 (1999).  In addition, in
the case of intangible property (*e.g.* the salvor's inchoate lien), the "arrest" warrant is executed
by leaving a copy of the summons and complaint directing any person having control of the
property (*e.g.,* in the case of the salvor's inchoate lien, the salvor) to "show cause why it should
not be paid into court to abide the judgment." and the clerk issue such supplemental process as
may be required to enforce the Court's order.  *See* Fed. R. Civ. P. Supplemental Rule C(3), C(5),
For a general description of the mechanics, *see generally* 4 *Benedict On Admiralty* §3.02[D][5].
The "arrest" in shipwreck cases does not give the Plaintiff any rights of ownership or a salvage
award, but instead simply protects the Plaintiff's already-existing inchoate lien and right to
continue its salvage efforts. *See R.M.S. Titanic, Inc.,*  286 F.3d. at 206   Plaintiff must then
provide such notice by publication, as well as notice to the original owners and other apparent
claimants, as the Court may direct.  If and when Plaintiff petitions for title to specific artifacts or
seeks a salvage award, it would, of course, be required to have an actual, as opposed to
constructive, arrest made with respect to such recovered items as may be sought, and to give
such notice to persons with actual or potential interests, as the Court may require.  *See, e.g.*
*R.M.S. Titanic,* 171 F.3d. at 967.  Typically, the Substitute Custodian files "Reports of Substitute
Custodian" on an annual, or if the Court directs, a more frequent basis; these apprise the Court of
the progress of the salvage effort and actions taken by the Substitute Custodian to protect the
scientific,  historical and educational values of the shipwreck.   In sum, unlike situations
involving a "live" ship where a detailed and exact description is required because the owner or
claimant may be dispossessed of property in actual use in commerce (sometimes at a commercial
cost of hundreds of thousands of dollars per-day in "loss of use" claims), the functional

Intervenors' misapprehension of the functional nature of admiralty practice and procedure, with its "exceeding liberal" pleading standards,[22] and its historical focus on getting to the merits of a case without cumbersome procedural hurdles, rigid forms or strictures, *see* 3A *Benedict On Admiralty* §287, is nevertheless certainly understandable in light of the sharp contrast between the traditions of the common law, on the one hand, and maritime jurisprudence, on the other.[23]

In any event, Intervenors have clearly been able to identify their interest and frame a responsive pleading. Indeed, by virtue of its claim of sovereign omnipresence, the State of Michigan purports to own all abandoned vessels in Michigan state waters.[24] *See* Intervenors' Motion to Intervene and Support Brief. As sovereign, the State of Michigan has consistently stated its ownership of its bottomlands, not merely in this case but in case after case on the subject.

As for Intervenors' professed concern that there may be an "inventory" of vessels satisfying the description in the Amended Complaint, that is clearly not the case—and they can identify none. As noted in the Verified Amended Complaint and the affidavits on behalf of Great Lakes

---

considerations underlying the Rule C/Rule E arrest procedure are very different in shipwreck cases, where the "arrest" creates no substantial commercial loss or irreparable harm to the owner or claimant to the shipwreck, who has the right to further notice and hearing in the event that the salvor seeks to convert its inchoate rights into an actual salvage award.

[22] *Netherlands S.S. Co.*, 301 F.2d 105, 107 (2d Cir. 1962). *See also Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 808 (2d Cir. 1971).

[23] This contrast reflects the origins of admiralty in Roman and related civil law systems of jurisprudence such as the Code of Oleron and the Rhodian Sea Law, providing the foundation for the functional nature of admiralty as focused on inherently transient transnational actors, issues and transactions which—because of the demands of multicultural issues and of mariners who frequently come from different backgrounds—requires a non-technical, simple, straight-forward focus on the merits of disputes rather than rigid rules of procedure. *See* 3A Benedict On Admiralty §287 n.1. *See generally* Robol, *Admiralty's Adjudicatory Jurisdiction Over Alien Defendants: A Functional Analysis* 11 J. MAR L & COM 395 (1980) *and cases cited therein*.

[24] Although the Motion to Dismiss claims Intervenors' inability to "conduct an investigation", it has not asserted that Intervenors are unable to frame a responsive pleading. *See* Int Br at 3.

Exploration, there is but one, and only one, vessel satisfying the criteria set forth in the Verified Amended Complaint.[25] Any person claiming an interest in the Defendant has ample notice of its interest.[26] The Verified Amended Complaint identifies Plaintiff and identifies its relationship to the Field Museum and the successor-in-interest to the presumed original owner of the Defendant. It describes Defendant's maritime nature and the location of the primary and secondary debris field, together with Defendant's essential distinguishing characteristics *qua* sailing vessel.[27] These allegations fall within the standard forms of admiralty practice and procedure for salvage complaints which have been approved for many generations.[28] For this reason, Intervenors' Motion cites no precedent holding such a description to be inadequate—in fact, it cites no precedent for its assumption that in a shipwreck case the complaint must describe the existing condition of the vessel, rather than its condition at the time of the sinking.

Still, Intervenors' Motion suggests that Defendant's location is too general, even implying that a pinpoint location should be publicly promulgated. Of course, such a pinpoint location is not only impracticable, given the artifact scatter and debris field, but also imprudent, given the risk of irreparable damage to the wreck site by looters and relic hunters. *See* Affidavit of Dr.

---

[25] If, as Intervenors suggest, there were "numerous" vessels fitting the Defendant's description in the State's "inventory," then surely, as the public repositories of the history of Michigan's bottomlands, Intervenors should have little difficulty identifying for the Court at least one or two—aside from the solitary vessel publicly identified by the State's Archaeologist which *falls squarely outside the Abandoned Shipwreck Act*. *See* Affidavit of Dr. Scott Demel; Affidavit of Steven Libert.

[26] Of course, the Court has broad power to fashion such further notice as it deems appropriate under Fed. R. Civ. P. Suppl. Rule C.

[27] Am. Compl. ¶7. *See also* Affidavit of Dr. Scott Demel; Affidavit of Steven Libert. The high energy conditions arising from the ancient geologic features and weather conditions of this area have been well-known to mariners since pre-Colombian times, and would, of course, be well-known to any person claiming an interest in the Defendant vessel, as would the intrinsic enduring features of Defendant, given its hand-hewn, wooden composition. *See* Affidavits of Dr. Scott Demel; Affidavit of Steven Libert. *See also* Am. Compl. ¶6.

[28] See 4 *Benedict On Admiralty* -Forms (Forms 1-1, 1-2, 1-3), attached as Ex. 3.

Scott Demel; Affidavit of Steven Libert. As for the Intervenor Brief's suggestion that Great Lakes Exploration or the Field Museum are nevertheless legally required to publish a pinpoint location, such a suggestion misapprehends federal and state law and policy.[29] It also misapprehends the science and nature of underwater exploration and archaeology. *See* Affidavit of Dr. Scott Demel (need to study entire shipwreck *in situ*, including entire debris field and associated artifacts).

For this reason, the leading maritime courts around the country have repeatedly found far larger areas, and far more general descriptions, to be sufficient. For example, in *Columbus-America v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.*, the U.S. District Court for the Eastern District of Virginia issued a preliminary injunction, approving a description of the "Unidentified, Wrecked, and Abandoned Sailing Vessel" "located within a circle having a radius of 15 miles".[30] On appeal, the U.S. Court of Appeals for the Fourth Circuit affirmed. Countless other cases have approved similar descriptions in shipwreck litigation.[31]

---

[29] *See* Abandoned Shipwreck Act Guidelines, 55 FR 5011, Part II – Guidelines (D9) (while the Act requires that the public be given "adequate notice of the location of any shipwreck to which title is asserted," 43 U.S.C. §2105(b), the Act's Guidelines have explicitly recognized that such "adequate notice " does not require a pinpoint location, and "[w]hen there is reason to believe that disclosure of the exact location (such as Loran coordinates) of a particular historic shipwreck would lead to vandalism, pilferage, or other damage to the site, locational information of a more general nature should be given for that site" and "the level of specificity of information given should be determined on a case by case basis and *should reduce the likelihood of anticipated damage to the particular historic shipwreck.*") (emphasis added). Contrary to Intervenors' assumption, identification of the vessel's structural features at the time of sinking is consistent with the Abandoned Shipwreck Act, itself. *Compare* 55 FR 5011 Part II – Guidelines D1(b) (identification should "summarize" vessel's structural features, wreck incident, salvage operations and prior expeditions) *with* 55 FR 5011 Part II – Guidelines D6 (encouraging *in situ* exploration and preservation, and conversely discouraging the removal of artifacts or destructive testing methodologies).

[30] See Ex. 4, attached.

[31] In the event that the Court nevertheless decides not to follow such precedents, Plaintiff respectfully moves for leave to amend to correct any pleading deficiencies identified by the Court.

Great Lakes Exploration hopes, consistently with the purpose and vision of the Abandoned Shipwreck Act itself, that Intervenors might reconsider their position. In passing the Act, it was Congress' vision that public and private authorities would work in concert, not in competition, in the exploration and preservation of shipwrecks. *See* 43 U.S.C. §§2103-2104. Shipwrecks offer countless opportunities for advancing public and private education, to the benefit of present and future generations of students, scholars, and the public. It is regrettable that valuable public resources must be diverted from such efforts and instead channeled into this litigation—litigation which could potentially consume years of proceedings in the first instance and on appeal—when all would be better served by working together.

## CONCLUSION

The Court should deny the Motion to Dismiss.

Respectfully submitted,
GREAT LAKES EXPLORATION GROUP LLC

By: *//s// Richard T. Robol*                  *//s// Roger Boer*

| | |
|---|---|
| Of Counsel | Of Counsel |
| Richard T. Robol (OH- 0064345) | Roger Boer, Esq. |
| ROBOL & WINKLER LLC | 161 Ottawa Avenue N.W. |
| 555 City Park Avenue | Suite 600 |
| Columbus, OH 43215 | Grand Rapids, MI 49503 |
| Telephone: (614) 559-3839 | Telephone. (616) 233-5136 |
| Facsimile: (614) 559-3846 | Facsimile: (616) 459-5102 |
| rrobol@columbuscounsel.com | |

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2005, a copy of the foregoing was served by the Court's ECF service upon all counsel of record.

*//s// Richard T. Robol*