**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**Northern Division**

| | |
|---|---|
| GREAT LAKES EXPLORATION GROUP LLC | ) ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:04-CV-375 |
| | ) |
| The Unidentified, Wrecked and (For Salvage-Right Purposes), Abandoned Sailing Vessel, etc. | ) HON. ROBERT HOLMES BELL ) |
| Defendant, et al. | ) |

**PLAINTIFF GREAT LAKES EXPLORATION'S CORRECTED BRIEF IN OPPOSITION TO STATE'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Great Lakes Exploration LLC respectfully files this Memorandum in Opposition to the Intervenors' Motion for Summary Judgment. The Intervenors' Motion reflects the third successive motion filed by the Intervenors asking the Court to dismiss this case. It asks the Court to hold, without affording a trial for either Great Lakes Exploration or the Republic of France, that title to the defendant is vested in the State of Michigan, regardless of whether the defendant is the *Griffin*.[1]; *See* Interv Br Support Motion SJ, 12-23-08, at p. 3.

---

[1] The *Griffin* was the first sailing ship on the Great Lakes. The story of her role in the explorations of her commander, famed French explorer and Governor, Sieur Rene Robert Cavelier, de la Salle, has provided a window into time for educating many generations of students, young and old, about the shared cultural heritage of the peoples of France, Canada, and the United States. Great Lakes Exploration sincerely hopes that, regardless of the ultimate outcome of this litigation, the shared heritage and story of the *Griffin* will continue to foster the education of future leaders and citizens in each of these three great nations.

As discussed below, a key mission of La Salle was reconnaissance to help defend and expand France's territorial and trading claims in the New World. During his reconnaissance operations, LaSalle searched for ports suitable to the military and commercial needs of the day; established colonial settlements and religious missions to provide a strategic defensive buffer against encroachments by the English colonists on

1

By its express terms, this latest motion rests solely on Fed. R. Civ. P. 56. *See* Interv Br at pp. 1, 3. The Intervenors have conceded that the procedures and protections afforded by Rule 56 govern the process for adjudicating this motion. *See id.* at pp. 3-4. The Intervenors have further conceded that in order to be entitled to summary judgment, the Intervenors must demonstrate the absence of a genuine issue of material fact regarding each of two separate issues: (1) the abandonment of the *Griffon* by the Republic of France and (2) the embedded status of the shipwreck. Interv Br at 5.

As discussed below, the record reveals a genuine issue of material fact as to each of these issues. Therefore, there are at least two separate and distinct grounds for denying the Intervenors' Motion. First, the record reveals one or more genuine issues of material fact regarding whether the *Griffon* is abandoned. Second, there are one or more genuine issue of material fact regarding whether the *Griffin* is abandoned.

---

the Atlantic seaboard; searched for a water passage to Cathay; and claimed new territories for the Crown of France. After assisting in the establishment of Fort Frontenec, Lasalle discovered the Ohio River, initially traveling to modern-day Cincinnati and perhaps as far as Louisville. He ultimately helped found French settlements along the Ohio River, west to the Mississippi and thence south to the Gulf of Mexico.

Launched near Niagra in 1670, the *Griffin* was a ship of war, carrying seven brass cannon and of 40 tons burden. During her voyages of discovery, the *Griffin* sailed across the uncharted waters of Lake Erie, up the Detroit and St. Clair Rivers, into Lakes St. Clair and Huron, and thence to Lake Michigan, reaching modern-day Green Bay, Wisconsin.

For purposes of their Motion for Summary Judgment, the Intervenors have not argued that the Defendant shipwreck is not the *Griffin* or that the Republic of France was not the lawful owner of the vessel at the time of its sinking. *See* Pl Mem Support Motion SJ. Since those matters have not been raised in the Intervernors' Brief, they are not addressed here. *See* Verified Claim of Republic of France.

# FACTS

The key facts are set forth in the affidavits of Wayne Lusardi and Louis Reinwasser on behalf of Intervenors; the Declarations by Richard Gross, Jeffrey Morris, Steve Bilicki, and Steven Libert on behalf of Great Lakes Exploration; and Great Lakes Exploration's second amended complaint.

This matter is on remand from the U.S. Court of Appeals for the Sixth Circuit. Pursuant to the remand, the Court has issued the warrant for arrest of the Defendant. The Court also provided for notice by publication. The Intervenors have filed their claim and answer.

Plaintiff has filed its notice of non-opposition to the filing of a formal written claim by the Republic of France. France had previously asserted its ownership through filings of the U.S. Department of State notifying the parties and the Court of France's interest in the *Griffon*. No one has opposed or otherwise responded to the notice.

On December 23, 2008, the Intervenors filed their Motion for Summary Judgment. On January 27, 2009, France filed its formal written claim to supplement the earlier assertions of its interest submitted by the U.S. Department of State. In its verified claim, France stated that:

> (1) it is the owner of the shipwreck of *Le Griffon*; (2) it has not abandoned its interests in *Le Griffon*; and (3) the Republic of France maintains its interests in *Le Griffon* as a sovereign vessel of the Crown of France, performing sovereign functions at the time of her loss, including as a vessel of exploration and warship on behalf of the Crown.

Claim of France, 1-27-09, at p.1.

As noted above, for purposes of its Motion for Summary Judgment, the Intervenors have not contested that the *Griffin* is owned by the Republic of France and

was performing sovereign military and commercial missions at the time of her loss. Mr. Gross notes that the *Griffin* was a sovereign warship of the Crown of France, and that it was performing sovereign functions on behalf of the Crown at the time of sinking.

In his affidavit, Wayne Lusardi states that the State of Michigan has performed an investigation of the shipwreck targets comprising the defendant. He has confirmed the presence at the wreck site of the timber, believed by Great Lakes Exploration and its team of experts to be the bowsprit of the *Griffin*. He states that comparing the photographs of the Griffin provided by Great Lakes Exploration on its web site, to those taken under his direction, indicates that the timber has not changed orientation, and is, therefore, embedded.

Mr. Lusardi's affidavit also states that a visual search by divers of the Michigan State police did not reveal the presence of any other artifacts, or at least that those that were seen could not have been associated with the *Griffin*. Mr. Lusardi did not perform any analysis for testing of the artifacts mentioned, but concluded that they could not be associated with the *Griffin* based on reading the verbal descriptions of the Michigan State troopers who performed the dives. Mr. Lusardi's affidavit states that Michigan State troopers were unable to see any significant underwater cultural deposits at the sites that viewed. It also states that the timber, believed by Great Lakes Exploration and its team of underwater archaeologists and historians to be the bowsprit of the *Griffin* (hereinafter, the "bowsprit") is embedded. Mr. Lusardi does not base his viewpoint on any scientific equipment or measurements. Instead, he states that it is his visual observation that the object is embedded based on photographs showing that it has not collapsed to the seafloor.

In fact, the only scientific equipment by the Intervenors to investigate the wreck site was a GPS unit.[2] *See* Answer #3, Intervenors' Answers to Interrogatories (sealed). The Intervenors did not use any kind of side scan sonar. They did not use any magnetometer. They did not use any kind of sub-bottom profiler. They did not use any of the other technologies essential for a scientific underwater archaeological investigation. *See id.* The total time spent by the Intervenors in diving on the Defendant was less than five or six hours. *See* Answer #1, Intervenors' Answers to Interrogatories(sealed).

In addition to Mr. Lusardi's affidavit, the Intervenors support their Motion for Summary Judgment with the Affidavit of their counsel, Louis Reinwasser, Esq. Mr. Reinwasser states that the Plaintiff published notice of the arrest of the Defendant in the Grand Rapids Press and the Marquette Mining Journal from July 10, 2008 through July 14, 2008. The notice stated that persons claiming an interest in the Defendant should file their claim within 10 days, and their answer within 20 days:

> ***on pain of being barred of all relief, or of having default entered, or such action taken in the premises as the court may deem proper.

Defendants submit various declarations in opposition to the Motion, including declarations by Steve Bilicki, Jeffrey Morris, Steven Libert, Kenneth Vrana's, and Richard Gross.

---

[2] The Court may take judicial notice of the fact that GPS units are simply devices for determining the location of a particular area on the earth's surface.

# THE COMPREHENSIVE FEDERAL LEGISLATIVE SCHEME CREATED BY THE ABANDONED SHIPWRECK ACT

**Overview**

In the Abandoned Shipwreck Act of 1987, 42 U.S.C. § 2101 et seq.(the "ASA"), Congress enacted a comprehensive legislative scheme to address the management and ownership of shipwrecks in navigable waters. The key operative provision of the ASA provides:

> (a) United States title
> The United States asserts title to any abandoned shipwreck that is-
> (1) embedded in submerged lands of a State;
> (2) embedded in coralline formations protected by a State on submerged lands of a State;
> (3) on submerged lands of a state and is included in or determined to be eligible for inclusion in the National Register.
>
> (b) Notice of shipwreck location; eligibility determination for inclusion in National Register of Historic Places
> The public shall be given adequate notice of any shipwreck to which title is asserted under this section. The Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that a shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3).
>
> (c) Transfer of title to States.
> The title of the United States to any abandoned shipwreck asserted under subsection (a) of this section is transferred to the State in or on whose submerged lands the shipwreck is located.

**Definition of "Abandoned" Under the ASA**

Under the ASA, the National Park Service is required to publish detailed, concrete guidelines implementing the Act. *See* 42 U.S.C. § 2104(a). The national guidelines make clear that the vessel of a sovereign remains the property of the nation to which it belonged, regardless of its location, unless that nation has taken formal action to abandon it:

> As used in the ASA, an "Abandoned shipwreck means any shipwreck to which title voluntarily has been given up by the owner with the intent of never claiming any right or interest in the future and without vesting ownership in any person.**** *Although a sunken warship or other vessel entitled to sovereign immunity often appears to have been abandoned by the flag nation, regardless of its location, it remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party.*"

55 FR 5011 Part I – Definitions (emphasis added). As discussed below, the Act's usage of the term "abandonment" is consistent with established principles of international maritime law that the vessel of a foreign sovereign can never abandoned unless the foreign sovereign expressly takes formal action to abandon it.

**Definition of "Embeddedness" Under the ASA.**

The ASA defines embedded:

> The term "embedded" means firmly in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, *and any part thereof*.

42 U.S.C. § 2102(a) (emphasis added).

The Act's guidelines make clear as used in the ASA, the term "embedded" means that "access" can be gained only through the use of "tools of excavation," which mean such things as explosives, mechanical dredges, blow torches, and the like:

> Embedded as defined in the Act means firmly affixed in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck****Tools of excavation would include, but not be limited to, hydraulic, pneumatic, or mechanical dredges, explosives, propeller wash deflectors, air lifts, blow torches, induction equipment, chemicals, and mechanical tools used to remove or displace bottom sediments or coralline formations to gain access to shipwrecks.

55 FR 5011 Part I – Definitions

**ASA Goal of Public Private Cooperation**

The overarching policy goal of the Congress in passing the ASA was to foster public-private cooperation in exploration and recovery. *See* 43 U.S.C. §§2103-2104.

**ARGUMENT**

I. **INTERVENORS HAVE FAILED TO CARRY THEIR BURDEN OF ESTABLISHING THE ABSENCE OF ANY GENUINE ISSUE OF MATERIAL FACT REGARDING THE ALLEGED ABANDONMENT OF THE *GRIFFIN*.**

The gravamen of Intervenors' Motion is that the *Griffin* is abandoned because (1) the Plaintiffs' Second Amended Complaint admits that the shipwreck is abandoned; and (2) the *Griffin* sank in 1617 and abandonment can be inferred from the passage of time and the alleged failure of France to assert a claim.

Intervenors' first argument reflects their good faith misunderstanding of the complexities of admiralty law. Intervenors argue that the allegation in Great Lakes Exploration's Second Amended Complaint that the "vessel" was "abandoned for salvage-right purposes" is an admission that the shipwreck is "abandoned" under the ASA. *See* Int Br at 7.[3]

---

[3] The Second Amended Complaint alleges that the Defendant is abandoned "[f]or salvage-Right Purposes" and "for purposes of Plaintiff's rights of salvage" (*Compare* 2nd Am. Compl., Caption, *with* 2nd Am. Compl. ¶13. The Second Amended Complaint further states that "Plaintiff is conducting its current analysis, investigation and operations with the express written permission of the entity which it believes is or may be the legal successor-in-interest to the original owner." 2nd Am. Compl. ¶ 4. By definition, since the original owner's successor has given permission, the vessel is not abandoned.

In the context of a salvor's claim for salvage rights, "abandonment" of a vessel occurs when the master of the vessel terminates the voyage and orders the crew to abandon ship, thereby terminating the contract of carriage and discharging crew members. In commercial salvage law, such "abandonment" of the vessel is significant because once the vessel has been abandoned, the crew members are no longer under a duty to save the vessel, and can qualify as "volunteers" and, as such, they "will be entitled to claim a reward for salvage services" rendered in rescuing the vessel from a marine peril. Steel & Rose, *Kennedy's Law of Salvage* §§473, 1088 (5th ed.). Thus, "Should a vessel be abandoned without hope of recovery or return, the right of property still remains in her owner." 3A *Benedict On Admiralty* §150 (2003), *and cases cited therein. See also Chance v. Certain Artifacts*, 606 F.Supp. 801 (S.D. Ga. 1984), *aff'd* 775 F.2d 302 (11th Cir. 1986); C. Davis, *Maritime Law Desk Book* at 289-90 (1989).

Admiralty law thus distinguishes "abandonment of a vessel" for purposes of allowing salvage (which occurs when the crew leaves the vessel) from "abandonment of a shipwreck" for purposes of loss of ownership rights.[4] By its express terms—for obvious reasons under the Fifth Amendment's "takings" clause --the Abandoned Shipwreck Act covers only abandoned shipwrecks "to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101(b).

The Intervenors' second argument also reflects their good faith misapprehension of the law of admiralty. Contrary to the Intervenors' assumption, the admiralty doctrine of inferred abandonment does not apply to the property of sovereigns. In fact, the ASA rejects the doctrine of inferred abandonment for sovereign vessels. *See* 55 Fed. Reg.

---

[4] *See* 3A *Benedict On Admiralty* §134 n.6, §158. *See also* Abandoned Shipwreck Act Guidelines, 55 FR 5011 Part I – Definitions.

50121 (1990) (property of a foreign sovereign "remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party.").

In this respect, the ASA is consistent with international maritime law. Under the law of nations,[5] sovereign property owned or controlled by a foreign sovereign remains vested in that sovereign, and does not pass to another, absent the sovereign's express agreement. *See, e.g., Seahunt v. Kingdom of Spain,* 221 F. 3d 634 (4th Cir. 2000). In *Seahunt,* the U.S. Court of Appeals for the Fourth Circuit considered a claim by the Commonwealth of Virginia, among others, that it was the owner of Spanish vessels on its bottom land. The Court of Appeals rejected this claims, noting that:

> Applying the express abandonment standard to sovereign vessels also respects the legitimate interest of the executive branch. While the ASA confers title to abandoned shipwrecks to the states, it does not vitiate important national interest or undermine the well-established prerogatives of sovereign states.

221 F.3d at 643.

Under the Abandoned Shipwreck Act, as well as maritime and international law, property of a foreign sovereign thus "remains the property of the nation to which it belonged at the time of sinking unless that nation has taken formal action to abandon it or to transfer title to another party." 55 Fed. Reg. 50116, 50121 (1990). The principle that sovereign vessels must be treated differently from privately owned ones also finds support in the legislative history of the Abandoned Shipwreck Act. *See, e.g., Sea Hunt*, 221 F.3d at 641 ("The House Report incorporates a State Department letter, which states,

---

[5] Under the Constitution and laws of the United States, international law is considered part of our own law. *See, e.g., Murray v. The Charming Betsy*, 6 U.S. 64, 118 (1804) (concluding "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

"the U.S. only abandons its sovereignty over, and title to, sunken U.S. warships by affirmative act; mere passage of time or lack of positive assertions of right are insufficient to establish such abandonment." H.R. Rep. No. 100-514(II), at 13 (1988), reprinted in 1988 U.S.C.C.A.N. at 381. The implications of this for other sovereign vessels is also underscored: '[T]he same presumption against abandonment will be accorded vessels within the U.S. territorial sea that, at the time of their sinking, were on the non-commercial service of another State.' Id.").

The U.S. Court of Appeals for the Sixth Circuit has also made clear that the admiralty doctrine of inferred abandonment does not apply to sovereign vessels. *See Fairport International Exploration, Inc. v. The Shipwrecked Vessel,* 177 F.3d at 500. For example, the U.S. Department of the Navy has noted that except for capture in battle, a nation loses its ownership interest in sovereign state vessels only through a formal express abandonment of its rights, and "'A Coastal State does not acquire ownership of a sunken state vessel by reason of its being located on, or embedded in, land or the seabed over which it exercises sovereignty or jurisdiction.'" Naval Historical Center Rand Pixa, *In Defense of Perpetual Title to Sovereign Wrecks*, available at http://www.history.navy.mil/branches/org12-7m.htm. *Accord* Robert Neyland, *Sovereign Immunity and the Management of United States Naval Shipwrecks,* available at http://www.history.navy.mil/branches/org12-7h.htm.

Moreover, even if the doctrine of inferred abandonment were applicable to sovereign vessels, the Intervenors' motion would still fail. Contrary to the Intervenors' assumption, the Republic of France has consistently asserted its interest in the *Griffin*. From the earliest stage of this case, France has given notice of its ownership interest in

11

the *Griffin* in accordance with the precepts of international law. *See* Affidavit of Michel Chanoux. *See, e.g.* Plaintiffs' Notice of Filing of U.S. State Department Communication, 8-18-05, and attachment thereto (e.g., e-mail of Robert C. Blumberg, Esq., U.S. Department of State, Office of Ocean Affairs, 7-26-05, noting France's assertion that the "Griffin was a state vessel"; Memorandum on Status of the Griffon, Republic of France, Ministry of Foreign Affairs, 7-8-05, describing "France's rights to the wreck of the Griffon," noting that the building of the *Griffon* was under the auspices of, and financed by, the Crown of France to aid in the construction of forts, that the shipwreck who constructed the vessel was the royal shipwright, and that that the *Griffon* has been considered a royal vessel in the ancient documents of France's historians; fax of Robert C. Blumberg, Esq., U.S. Department of State, Office of Ocean Affairs, 7-27-05- attaching original French documents supporting France's ownership of the *Griffin*).

Through its communications with the U.S. Department of State, France has thus confirmed its ownership of the *Griffin*. In accordance with customary international law, the U.S. Department of State has also given notice of France's interest in the *Griffin*.

> Under customary international law, any contact with other nations about their sunken warships or other vessels is through the U.S. Department of State.

*See* guidelines, Abandoned Shipwreck Act, 55 Fed. Reg. 50116 (1990).

Promptly upon receiving the authorization of the U.S. Department of State that doing so would not violate France's duty of non-interference in the internal affairs of the United States under international law, France filed a formal written claim. *See* Affidavit of Michel Chanoux.

12

Formal, express abandonment is also required under the recently enacted Sunken Military Craft Act. Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1402, 118 Stat. 1811, 2094-95 (Oct. 28, 2004) (codified at 10 U.S.C. § 113 note) [hereinafter the Sunken Military Craft Act. The Sunken Military Craft Act makes clear that "[n]o person may possess, disturb, remove, or injure any sunken military craft in violation of this section." *Id.* The Act expressly exempts acts of the United States from its coverage, but does not create any such exemption for acts by individual states, such as Michigan. *Id.*

> The term 'sunken military craft' means all or any portion of--
> "(A) any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government on military noncommercial service when it sank;
> "(B) any sunken military aircraft or military spacecraft that was owned or operated by a government when it sank; and
> "(C) the associated contents of a craft referred to in subparagraph (A) or (B),
> if title thereto has not been abandoned or transferred by the government concerned.

*Id.*

The Intervenors have not disputed the overwhelming record evidence that the *Griffin* was a military vessel of the Crown of France at the time of her loss. She was on a critical reconnaissance operation to establish what, in today's military operational art, would be described as reconnaissance to permit the establishment of FOBs (forward operating bases) to create a strategic defensive buffer to preclude the expansion of the English colonists westward. The *Griffin* qualifies as a sunken military craft. *See* Declaration of Richard Gross; *see also* Affidavit of Michel Chanoux

Finally, it should be noted that the Intervenors bear the burden of proving abandonment by clear and convincing evidence. *Fairport International Exploration, Inc.*

13

*v. The Shipwrecked Vessel,* 177 F.3d at 501.  ("The uniform rule in admiralty law is that a ***finding of abandonment requires proof by clear and convincing evidence***\*\*\*\*) (emphasis added).

In sum, contrary to the premise of Intervenors' Motion, there is thus a genuine issue of material fact as to whether the State of Michigan has carried its burden of proving by "clear and convincing evidence" that the Defendant is abandoned.

II. **AS AN INDEPENDENT GROUND FOR DENYING THE MOTION FOR SUMMARY JUDGMENT, THE INTERVENORS HAVE FAILED TO CARRY THEIR BURDEN OF ESTABLISHING THE ABSENCE OF ANY GENUINE ISSUE OF MATERIAL FACT REGARDING THE ALLEGED ABANDONMENT OF THE GRIFFIN.**

In support of its claim that there is no genuine issue of material fact regarding the allegedly "embedded" nature of the shipwreck, the Intervenors rely upon the affidavit of Wayne Lusardi.  But on its face, Mr. Lusardi's affidavit demonstrates that under the definition of "embeddedness" in the ASA, the shipwreck is not embedded.  Mr. Lusardi's affidavit admits that he was able to get access to the timber believed by Great Lake Exploration's experts to be the bowsprit of the *Griffin*.  *See* Lusardi affidavit, ¶ 10.  In fact, Mr. Lusardi's affidavit attaches photographs showing that the timber is easily accessible without any tools of excavation.  Mr. Lusardi's affidavit further admits that he did not use any tools of excavation, and, further, he "made no effort to gain access to buried portion of the timber."  Lusardi affidavit, ¶ 10.  Therefore, it is clear that the item is not embedded within the definition of the Abandoned Shipwreck Act that "The term 'embedded' means firmly in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, ***and any part thereof***."  (emphasis added).

14

Moreover, a close reading of Mr. Lusardi's affidavit shows that he does not deny that even the "buried" portions of the shipwreck can be accessed without "tools of excavation" as defined in the ASA. While Mr. Lusardi states that a dredge is preferable to a shovel, and that digging by hand could obscure the wreck site, he does not deny that given the currents in the area, any work will be in low visibility conditions no matter what. And his argument that a dredge "is preferable" does not satisfy the statutory standard that "use of tools of excavation is **_required_** in order to move the bottom sediments to gain access to the shipwreck, its cargo, **_and any part thereof_**." And while Mr. Lusardi argues that the timber is embedded because it has not collapsed to the seabed floor since 2004, he ignores the obvious fact that it may be in place because it is affixed to a larger structure (the hull of the ship) which is resting below the seafloor.[6] Given his failure to move any of the bottom sediments or to use any technologies (such as a sub-bottom profiler) that would be required to establish embeddedness, Mr. Lusardi's affidavit is little more than unscientific, rank speculation.[7]

---

[6] Mr. Lusardi's reasoning is a little like saying that a portable basketball hoop sitting in a parent's driveway must be embedded in the earth because it doesn't collapse onto the driveway. As any parent who has had one knows, the basketball hoop doesn't collapse because it is mounted on a tripod. The obvious explanation for the non-collapse of the bowsprit is not that it is embedded, but rather that it is supported by the hull of the *Griffin*, which rests in the easily moved sediment comprising the seabed.

[7] Mr. Lusardi's affidavit clearly does not qualify as expert opinion. The affidavit fails to articulate the definition of "embeddedness" on which he rests his assertions, nor does it articulate any other professional or scientific standard. *See* Fed. R. Evid. 702 ("Testimony By Experts") (expert opinion must be "the product of reliable principles and methods" and must "apply the principles and methods reliably to the facts of the case."). The affidavit does not state that any of the opinions offered are made to a reasonable professional certainty or are based upon applying any scientific or professional standard. Further, as discussed below, to the extent that the Intervenors offer Mr. Lusardi's affidavit as lay opinion, it is filled with flawed reasoning and leaps of logic that cannot stand up to the basic rules of inductive and deductive logic. Accordingly, the affidavit should be stricken and/or disregarded with respect to the opinions stated or assumed

As to artifacts other than the timber believed to be the bowsprit of the *Griffin*, Mr. Lusardi states that "the fact that we did not see any artifacts, with the exception of the timber described above, suggest that any other artifacts discovered by GLEG must be under the surface of the lake bottom and would likely also require the use of excavation tools to gain access to them." Lusardi affidavit, ¶ 11. Clearly, Mr. Lusardi is providing his own opinion that the lack of visible artifacts "suggests" that they would require tools of excavation. Again, this conclusion fails to satisfy the standards for expert opinion.

Once again, Mr. Lusardi's reasoning is clearly flawed. The fact that artifacts may not have been visible to him on the day he dove could be explained by the fact that they were covered by silt or other sediment; that clearly does not make them inaccessible, let alone demonstrate that tools of excavation are required in order to gain access. Once again, Mr. Lusardi is forced to make this leap of logic because he failed to use any of the standard tools for underwater archaeological investigation. *See* Declaration of Jeffrey Morris; Declaration of Steve Bilicki. He admits that the only technologies used were two GPS units, used to determine geographic locations. *See* Lusardi Affidavit, ¶6; Intervenors' Answers to Plaintiffs' Supplemental Interrogatories (filed under seal). The fact that something may be covered does not mean that tools of excavation are required to gain access to it. Mr. Lusardi admits to the high energy conditions, with considerable wave and current action, in the area. Lusardi affidavit, ¶ 10. His analysis does not consider the possibility that those actions obscured the artifacts with silt.

The Intervenors' also reference the Declaration of Dr. Scott Demel stating that depending on the results of the initial testing of the shipwreck structure, "the next phase of inquiry may be to employ the use of mechanical devices in a limited capacity to aid in

16

further testing, and perhaps also in the actual excavation and recovery of the vessel and its components." In fact, reviewing Dr. Demel's affidavit demonstrates that there are genuine issues of material fact as to whether the shipwreck is embedded. It may be useful to repeat here the test of embeddedness under the ASA. The test is not whether such tools of excavation may be useful to aid in testing; the test is whether they are *required* in order to gain access:

> The term "embedded" means firmly in the submerged lands or in coralline formations such that the use of tools of excavation is *required* in order to move the bottom sediments to gain access to the shipwreck, its cargo, ***and any part thereof***.

42 U.S.C. § 2102(a) (emphasis added).

As noted above, the State's own evidence make clear that tools of excavation are not required to gain access to the bowsprit. The photographs submitted by the State in support of its motion for summary judgment demonstrate that the bowsprit is clearly visible. It is readily accessible in its current state. No use of mechanical tools of exaction is required to gain access to the bowsprit. In fact, the affidavit of Dr. Demel which the Intervenors have invoked in support of their motion notes that improvidently using mechanical devices for underwater excavation may, in the case of archaeological sites, result in substantial loss of information and/or irreparable harm to the site conditions. In contrast to Mr. Lusardi, Dr. Demel would not recommend the use of mechanical devices for "excavating" the shipwreck site and is aware of no proposal for the use of such mechanical devices.

Even ignoring the State's own evidence, the record still reveals a genuine issue of material fact as to whether the Defendant is embedded. The declarations of Steve Bilicki and Mr. Libert, together with the videographic evidence of the seafloor's silty

17

composition, clearly demonstrate that the shipwreck is not embedded. The declarations of Mr. Vrana and Mr. Morris likewise demonstrate why the Intervenors' claim of embeddedness cannot be supported by professional standards of science or underwater archaeology. Mr. Libert's previously-filed affidavit also notes the errors in Mr. Lusardi's conclusion, including the fact that vessels in the area can be covered, in whole or in part, by significant sedimentation in the area over a period of time; that because of the geologic nature of the area, the bottom is highly susceptible to dispersion and scatter; that the bottom sedimentation is amenable for digging by hand, which, though more painstaking than the mechanical means suggested by Mr. Lusardi, tends to be a better method for protecting against loss of information about the shipwreck; that the area is not one characterized by coralline or similar geologic formations which embed shipwrecks (as may sometimes be typical in parts of the Caribbean Sea and other bodies of water located near the Equator); that the conditions indicate that that gradual sedimentation accounts for the condition; and that based on its current information, it does not appear that mechanical or similar devices are either needed or appropriate for the shipwreck site, and using mechanical devices could potentially result in loss of information and/or irreparable harm to the wreck site.

## CONCLUSION

For the foregoing reasons, the Court should deny the Intervenors' Motion for Summary Judgment.

Respectfully submitted,

/s/ Richard T. Robol
Richard T. Robol (0064345)
ROBOL LAW OFFICE, LLC
433 West Sixth Avenue
Columbus, Ohio 43201
(614) 737-3739
(614) 737-3756 (facsimile)
rrobol@robollaw.com
Attorney for Great Lakes Exploration, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically and served electronically on all counsel of record via the Court's ECF system this 17th day of February, 2009.

/s/ Richard T. Robol
Richard T. Robol