**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**Northern Division**

| | | |
|---|---|---|
| GREAT LAKES EXPLORATION | ) | |
| GROUP LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04-CV-375 |
| | ) | |
| The Unidentified, Wrecked and (For | ) | HON. ROBERT HOLMES BELL |
| Salvage-Right Purposes), Abandoned | ) | |
| Sailing Vessel, her tackle, | ) | |
| apparel, appurtenances, cargo, etc. | ) | |
| located within a circle having | ) | |
| a radius of 3.5 statute miles, whose | ) | |
| center point is at coordinates | ) | **REPLY BRIEF IN SUPPORT OF** |
| 45° 32.8′ North latitude and 86° 41.5′ | ) | **INTERVERNOR'S MOTION** |
| West longitude, | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| *In Rem* | ) | **Oral Argument Requested** |
| | ) | |
| Defendant, | ) | |
| | | |
| v. | | |
| | | |
| STATE OF MICHIGAN DEPARTMENT | | |
| OF HISTORY, ARTS, AND LIBRARIES | | |
| AND MICHIGAN DEPARTMENT OF | | |
| ENVIRONMENTAL QUALITY, | | |
| | | |
| Intervenors. | | |

_____/


**REPLY BRIEF IN SUPPORT OF INTERVENOR'S MOTION FOR SUMMARY**
**JUDGMENT**


I.   The Undisputed Facts Show The Defendant Is Abandoned

A.  Plaintiff's Claim of Ownership Requires A Finding of Abandonment

Paragraph one of Plaintiff's prayer for relief in the Second Amended Complaint asks that

Plaintiff be "declared the true, sole and exclusive ***owner*** and/or possessor of the Defendant

wrecked and ***abandoned*** sailing vessel..."[1]  Contrary to Plaintiff's assertion now that it only

alleged that Defendant was "abandoned" in the sense that the owner is merely no longer aboard

the vessel, to make a claim of *ownership* of a shipwreck as Plaintiff is doing here, a plaintiff

must allege and prove under the law of "finds" that the wreck is "abandoned" in the same way as

is meant under the Abandoned Shipwreck Act.[2]  Intervenor has admitted the truth of Plaintiff's

allegation that the Defendant is abandoned and there is thus no issue for the Court to determine.

B.  The Claim of France Is Untimely

1.  Both Plaintiff and France Knew That Timely Action Was Required

Since Intervenors filed this motion for summary judgment, counsel for Plaintiff has filed

a claim and an answer on behalf of the French government.  Intervenors have filed a separate

objection to France's claim and answer.  The filing of this claim at the 11th hour does not change

anything in this lawsuit.

This Court ordered Plaintiff to publish notices that required the filing of any claim within

10 days of the publication.  Not until this motion was filed did anyone asserting a claim come

forward.  The claim which France has now attempted to file missed the deadline by six months.

The argument that France believed it had already filed a claim is not persuasive.  The documents

Great Lakes Exploration Group, LLC (GLEG) now relies on to establish an earlier filing were

the subject of a motion to strike filed by the State.[3]  The Court found the motion to strike

---

[1] Docket #124 (emphasis added).

[2] 43 U.S.C. § 2101 *et seq*. (ASA); see *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel*, 177 F.3d 491, 498 (6th Cir. 1999). ("Where the owner has abandoned the ship, however, recent doctrine applies the law of finds, vesting title in the finder of the ship...the meaning of 'abandoned' under the ASA conforms with its meaning under admiralty law.")

[3] Docket # 52, filed August 17, 2005.  The State takes issue with GLEG's assertion that "No one has opposed or otherwise responded to the notice."  Docket # 146, p. 3.  The State clearly opposed this notice, and this Court "responded" to it as well.

unnecessary because the documents were "not material to any issue presently before the Court."[4] Shortly after the Court entered this order, GLEG filed a motion seeking permission to file a Second Amended Complaint[5] that essentially asserted that GLEG had permission of some kind from a "foreign sovereign."[6] The clear implication was that GLEG was working with France to salvage the wreck.

These facts are indisputable. For GLEG to now claim that it believes that France filed a claim several years ago, it must completely ignore this Court's finding that the documents were not material. Furthermore, GLEG itself was ordered to publish the notice giving claimants 10 days to file a claim. If, as it has claimed, it was working with France, why didn't GLEG explain to France that it must file any claim within the 10 days?

Nor has GLEG cited any authority that would allow the Court to permit the late filing of a claim, or alternatively, if such a late claim may be allowed, what the standard should be for granting relief from the 10 day requirement. The 10 day requirement is set forth in Supplemental Rules for Admiralty, Rule C(6)(A), governing the arrest of vessels, and while Rule C(6)(B) provides an alternative to the 10 days to be "within the time that the court allows," here the Court's order specifically "allowed" 10 days. It was GLEG who demanded that this Court arrest the Defendant. It should not be permitted to ignore the conditions of the arrest order, at least not without very good reason. Here, GLEG's excuse appears to be that France thought it had already filed a claim, but, as shown above, this is not believable because the Court specifically told GLEG that the papers it filed had no meaning in this litigation.

---

[4] Docket # 55, dated August 19, 2005.
[5] Docket # 57, dated September 21, 2005.
[6] *Id*. at ¶¶ 4-5.

2.    Inaction During Pending Litigation Can Result In Abandonment

Plaintiff also asserts that a vessel is never abandoned by a sovereign without an express act of abandonment. The question arises, however: what constitutes an *express* abandonment? Plaintiff has cited no case that is on point with the material facts of the instant case where: 1) both Plaintiff and France were aware since at least 2005 of the ongoing litigation, 2) a time period for filing a claim was established by court rule and court order and 3) in 2009, six months after the filing period has elapsed, the sovereign files a claim.  While it may make sense to say that a sovereign's failure to attempt to salvage a wreck or take other action asserting ownership over a wreck **before** litigation is filed cannot be deemed to be an abandonment, it is highly impractical to apply this standard where a sovereign has ample notice of pending litigation and decides to take no action.  Courts and litigants should not be put to the unnecessary expense and uncertainty that such a standard inevitably will create.

The cases cited by Plaintiff do not contradict this analysis.  *Sea Hunt v. Unidentified Shipwrecked Vessel*[7] stands for the proposition that the "express abandonment" standard applies to sovereign vessels.  "Under admiralty law, where an owner comes forward to assert ownership in a shipwreck, abandonment must be shown by express acts."[8]  This test makes it clear that for the express abandonment test to apply, the owner must *come forward* to assert its claim.  While no time period is discussed in that case, it is implicit that if an owner, even a sovereign, does not come forward it risks having the court enter an order awarding the vessel in question to the finder.  No one could seriously argue that anyone, even a sovereign, could still assert after entry of such an order, that it had not abandoned the vessel and that it should be allowed to make a claim.  This leads to the logical conclusion that a failure to act in the face of pending litigation

_____

[7] 221 F.3d 634 (4th Cir. 2000).
[8] *Id.* at 641.

can be an express act of abandonment.  Otherwise, a court could never bring a matter involving a potential claim by a sovereign to a conclusion.

Although the instant case has not progressed to final judgment, the Court has entered an order pursuant to Supplemental Rule C that intended the notice of claim to be binding "on all the world."[9]  Plaintiff has cited no authority for the proposition that such a notice is not binding on foreign sovereigns, nor does the rule provide such an exception.  In particular no exception should be found where, as noted above, both France and GLEG and their now common counsel were aware of the nature of this litigation long before the Court's order regarding notice of claims was published.  In such a case, inaction, where action is required by legal process, should be considered an express abandonment.

The second case relied on by Plaintiff supports this analysis.  In *Fairport Int'l Exploration*[10] the court discussed the express abandonment doctrine adopted in *Columbus-America*[11]:

> A court following the rule of *Columbus-America* may find abandonment only where it finds "a strong actus element required to prove the necessary intent," *id.* at 461; the decision offers as an example "an owner's express declaration abandoning title." *Ibid.* ... Cases support this proposition, see, *e.g.*, *Hener*, 525 F. Supp. at 357 ("[A] finding that title to such property has been lost requires strong proof, such as the owner's express declaration abandoning title.")...

Thus abandonment *could* be established by proof of an owner's express declaration abandoning title, but this quote makes it clear that this is only one "example" of such an action, and that the test is whether there is a "strong actus element" or other "strong proof" of abandonment.  In the case at hand, this element is satisfied by the French government's failure to file a claim for several years when it had clear notice of the litigation, and even after publication of the arrest notice.  Absence of an express declaration does not preclude such a finding of abandonment.

---

[9] Supplemental Rule C, 1966 Advisory Committee Notes to Subdivision (4).
[10] 177 F.3d at 499.
[11] *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450 (4th Cir. 1992).

Nor is the suggestion persuasive that France didn't want to interfere in matters in United States courts, so it left its interests in the hands of the State Department. While this may have been an accepted procedure 30 years ago, since the passage of the Foreign Sovereign Immunities Act,[12] foreign governments have generally represented their own interests in federal courts.[13]

Nor do the documents submitted by Plaintiff in support of the French claim evidence a request by France for the State Department to intervene in this litigation on its behalf. In fact, the email from Bob Blumberg[14] attached to the Chanoux Affidavit, indicates that the State Department was "in no way" intending "to influence any actions that [the Parties] or the court may decide is appropriate." This statement is inconsistent with any intention of the State Department to pursue a claim on behalf of France, as is now asserted by Plaintiff. A more reasonable interpretation of Mr. Blumberg's correspondence is that the State Department was waiting so see if France would take the necessary steps to participate in the litigation as a claimant. And there is no explanation of why neither the State Department nor France took any action after this correspondence to confirm France's alleged interest in the Defendant. There is no suggestion anywhere except in Mr. Chanoux's affidavit that the State Department was going to represent France's interest in this litigation. Intervenor respectfully suggests that, even if this Court was authorized to grant relief from the 10 day filing requirement, there is insufficient evidence to allow this belated claim on any theory that there was good cause for the delay.

---

[12] 28 U.S.C. §1602 *et seq.*

[13] *Sea Hunt, Inc. v. Unidentified, Shipwrecked Vessel or Vessels*, 22 F. Supp. 2d 521, 524 (E.D. Va. 1998)("This posture has most often been taken by foreign governments in cases involving the assertion of sovereign immunity previous to enactment of the Foreign Sovereign Immunity Act in 1976. See 28 U.S.C. § 1604."). In that case, the court refused to permit the United States to act as attorney for Spain in the admiralty proceedings.

[14] Docket #147-4. Mr. Blumberg worked for the State Department in 2005.

II.  The Defendant Is Embedded

    A.  Tools of excavation are needed to access some parts of the Defendant

        1.  Plaintiff misinterprets the ASA

The primary argument that Plaintiff makes to prove that the Defendant is not embedded, is that Intervenors admit they had "access" to the alleged bowsprit timber because Wayne Lusardi, the State's marine archeologist, submitted photographs with his affidavit that prove that he had access to the timber.  Plaintiff seems to be saying that because Mr. Lusardi could swim over and touch the timber, he had access to it and it is therefore not embedded.  This analysis misinterprets the ASA which states that a shipwreck is "embedded" if tools of excavation are required in order to move bottom sediments to gain access to the wreck "and any part thereof."[15] Merely because some parts of a wreck are visible above the lake bed is not relevant to the question of embeddedness if it is admitted, as Plaintiff has here, that other parts are below the lake bed.  Since the ASA definition of "embedded" applies if *any* part of the shipwreck is embedded, proof that some parts are not embedded is of no moment.

And in the present case, Plaintiff has asserted that the *entire hull of the wreck*, as well as other parts, are lurking below the visible bottom of Lake Michigan.[16]  Yet, Plaintiff claims that no tools of excavation, not even a hand trowel, the most basic of archeologist's tools, will be necessary to gain access to the wreck.  One can only wonder how Plaintiff can be so sure since, presumably, no excavation of this wreck has yet occurred, and apparently most of the objects Plaintiff claims are associated with the wreck are not even visible as they lie under the surface of the bottomland.  Plaintiff's strident accusations that Mr. Lusardi's affidavit is "unscientific, rank

---

[15] 43 U.S.C. § 2102.

[16] Plaintiff's Response Brief, p. 15 (Docket #146);Bilicki Declaration, p.2 (Docket # 157, filed under seal).

speculation" and "filled with flawed reasoning and leaps of logic" are completely unsupported. What Mr. Lusardi confirms is that there is nothing about this site that would suggest that the normal process of accepted underwater archeological techniques would not be required to gain access to parts of the wreck. As noted in the excerpts from accepted treatises on underwater archeology (attached to Mr. Lusardi's Second affidavit), standard practice for underwater archeology is to use excavation tools, at the very least, to remove "spoils" from the site under investigation. This would be particularly true of a large excavation site such as being proposed here. Even if no digging tools were used, the large amount of spoils generated by such an excavation could not reliably be floated away by water currents. Such currents are just as likely to merely redeposit the spoils on some other area of the site, even one where delicate excavation work has already occurred. Thus, to properly excavate this wreck, tools such as an air lift or water dredge are absolutely essential. Any rank speculation or leap of logic here is made *by Plaintiff* when it takes a position that is contrary to common sense (that the hull of an entire ship can be excavated without some tool use) and contrary to standard practice.

Plaintiff seems to be espousing a definition of "embedded" that would require the actual excavation of a shipwreck to prove whether the use of tools is or isn't required. This certainly wasn't what was intended when the ASA was enacted. As noted in Intervenors' initial brief, "embedded" was intended to ensure that wrecks protected by the ASA were of historical significance; in other words that they were ancient artifacts. Conducting a somewhat philosophical inquiry of whether something is "required" does not serve this purpose. That is particularly true where as here there can be no dispute that the Defendant (assuming it really is the Griffin as Plaintiff claims) has major historical significance. In a similar case, where objects

were admittedly buried under sediments, this Court found that there was "no question" that the artifacts were embedded.[17]

Mr. Lusardi's affidavit makes the logical point that even if it might be possible to move sufficient bottom sediments to gain access to some parts of the Defendant, if in fact the hull of the Griffin is buried on this site as Plaintiff asserts, it would still be impossible to hand fan away sediments to gain access to the *underside* of the hull. This is because the weight of the hull would compress the sediments so that hand fanning would not dislodge them, and even if it did, the hull would merely fall into the hole created by the absence of bottom sediments and no access would be acquired. Thus, some *tool* would be required to lift or prop up the hull to gain access to some of its parts. This would also be true for any other heavy objects, such as the two brass cannons that Plaintiff asserts were on the Griffin when it sank.[18]

## 2. Plaintiff's own declarations establish that tools are necessary

As noted in Intervenors' initial filing, Scott Demel has stated on behalf of Plaintiff that during the second phase of the investigation, tools of excavation might very well be needed.[19] Plaintiff notes Mr. Demel's comments regarding the use of tools to aid in testing, but denies that Mr. Demel would recommend the use of tools to excavate the wreck, even though Plaintiff quotes Demel's comment that "mechanical devices" maybe used "in the actual excavation and recovery of the vessel...".[20]

Also, Steve Bilicki's Rebuttal declaration filed with Plaintiff's response states that "liftbags" should be used for the excavation of this site.[21] Mr. Libert confirms that "airbags"

---

[17] *Fairport Int'l Exploration v. Shipwrecked Vessel*, 913 F. Supp. 552, 557 (W.D. Mich. 1995) *aff'd,* 105 F.3d 1078 (6th Cir. 1997), *vacated on other grounds*, 523 U.S. 1091 (1998).
[18] Gross Declaration, ¶ 43 (Docket # 146-6).
[19] See Intervnors' Brief, p. 11 (Docket # 134).
[20] Document # 146 pp. 16-17 (through the end of the first full paragraph on 17).
[21] Docket # 146-8, ¶ 32.

(which are the same as liftbags) would be used to excavate the Defendant.[22]  These declarations refer to the airbag/liftbag as a "non-mechanical" excavation "technique," and imply that an airbag or liftbag is not a "tool."[23]  Plaintiff's response seems to make a distinction between a "mechanical tool" and a "tool."[24]  However, nothing in the ASA in any way suggests that such a distinction exists or is relevant to the issue of embeddedness.  Nor does such a distinction arise in common usage.  The definition of "mechanical" is "of or relating to machines or tools."[25]  Liftbags, water dredges, trowels – all are tools of excavation.

Likewise, several of the declarations filed by GLEG indicate that "probing" of the site will be required.[26]  Probing is done with a metal or similar rod (sometimes with water pumped through it to assist in penetrating sediments) pushed into the lakebed until it strikes a solid surface, at which point the depth and position of that surface are recorded.[27]  Such probes are considered tools of underwater archeological excavation.[28]

>3.  Whether a phase II investigation is advisable is not relevant

The Declarations filed by GLEG argue that a "Phase II archeological assessment of the target locations be conducted as soon as possible in order to generate and evaluate additional

---

[22] Docket # 146-2, ¶15.

[23] The operation of such liftbags is described in the treatise excerpts attached to Mr. Lusardi's Second affidavit submitted with this reply.

[24] Docket # 146, p. 17.

[25] *The American Heritage College Dictionary*, 3d ed.

[26] Vrana Declaration, ¶12 (Docket # 156, filed under seal); Morris Declaration, ¶9 (Docket # 155, filed under seal); Bilicki Declaration, ¶9 (Docket #157, filed under seal).

[27] "Probing" is described in the treatise excerpts attached to Mr. Lusardi's Second affidavit submitted with this reply.

[28] Lusardi Second affidavit, ¶ 6.

evidence that will corroborate or refute the existence of an archaeological site or sites."[29]

Whether or not such an assessment is a good idea, it has nothing to do with the questions of embeddedness or abandonment now before the Court. Mr. Vrana asserts that until such an investigation is conducted "it is improper to claim that [the artifacts] are embedded."[30] He does not explain why this might be true. Plaintiff cites no law that supports the contention that a Phase II type investigation must be conducted before the Court can find that a shipwreck is embedded. As noted by Mr. Lusardi, "embeddedness" is not an archeological issue; it is a legal status. The Court does not need an expert's opinion on embeddedness, particularly where there is indisputable evidence such as the photographs and the video presented by both parties for the Court's review, as well as the admissions by Plaintiff that some or even most of the artifacts in question are buried and out of sight.[31] When these indisputable facts are added to the uncontroverted statement by Mr. Lusardi that the timber has not changed its location or attitude despite being subjected to high energy water currents for at least four or five years, the Court can readily conclude that this Defendant is in fact embedded.

Respectfully submitted,

Michael A. Cox
Attorney General


     /s/
Louis B. Reinwasser (P37757)
Assistant Attorney General
Environment, Natural Resources
   and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
517/373-7540

Dated: March 4, 2009                        Email: reinwasserl@michigan.gov

---

[29] Docket # 156, ¶ 20. See also Docket # 155, ¶ 11 and Docket # 157, ¶ 10.
[30] Docket # 156, ¶ 17.
[31] There is no evidence that the court relied on expert opinions in the *Fairport* case. 913 F. Supp. at 557.

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2009, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the counsel.

/s/  Louis B. Reinwasser

Louis B. Reinwasser (P37757)
Assistant Attorney General
Environment, Natural Resources
    and Agriculture Division
P.O. Box 30755
Lansing, MI  48909
517/373-7540
Email:  reinwasserl@michigan.gov