# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# Northern Division

| | |
|---|---|
| GREAT LAKES EXPLORATION GROUP LLC<br>    Plaintiff,<br>v.<br><br>The Unidentified, Wrecked and (For Salvage-Right Purposes), Abandoned Sailing Vessel, etc.<br>    Defendant, et al. | )<br>)<br>)<br>) Civil Action No. 1:04-CV-375<br>)<br>) HON. ROBERT HOLMES BELL<br>)<br>) |

## REPUBLIC OF FRANCE'S RESPONSE TO INTERVENORS' OBJECTION TO ANSWER & CLAIM OF FRANCE

### PRELIMINARY STATEMENT

The Republic of France, by counsel, respectfully files this Response to the Objection of Intervenors to the answer and claim of France.[1] As discussed below, the objection is without merit and unknowingly invites reversible error by indirectly seeking a ruling that is both legally and factually incorrect, *i.e.* that France has expressly abandoned its interest in *Le Griffon*.

Under established international maritime law adopted in the United States, the abandonment of sovereign vessels may not be inferred from inaction by a sovereign, regardless of the nature of such inaction. Instead, an abandonment can occur only through the sovereign's express abandonment of a shipwreck. In the present case, both France and the U.S. Department of State have repeatedly made clear that France (1) is the

---

[1] Prior to making this filing, counsel for the Republic of France endeavored to determine whether the Local Civil Rules created any page limitation on briefs responding to objections. To date, counsel has been unable to locate any such limitations. *Compare* W.D.MI Local Civil Rule 7.2 (b) (25 pages for dispositive *motions*) *with* Local Civil Rule 7.3 (b) (10 pages for non-dispositive *motions*). Counsel apologizes to the Court and opposing counsel if he has overlooked a page limitation rule applicable to briefs regarding objections, and respectfully moves the Court to enlarge the pages allotted if there is an applicable rule that has been inadvertently violated.

owner of the shipwreck *Le Griffon*; (2) has not abandoned its interests in *Le Griffon*; and (3) has maintained its interests in *Le Griffon* as a sovereign vessel of the Crown of France, performing sovereign functions at the time of her loss.

## FACTS & PROCEDURAL POSTURE

In response to the initial complaint filed by Plaintiff Great Lakes Exploration, LLC, the Intervenors intervened for the ostensible purpose of contesting the Court's subject matter jurisdiction. *See* Interv Motion to Intervene. Following the intervention, Great Lakes filed an amended complaint and, later, a second amended complaint.

When the Plaintiff's belief that the Defendant is the wreck of *Le Griffon* became public, France, through communications forwarded by the U.S. Department of State on its behalf, asserted its claim of ownership. Those communications noted that (1) the wreck of *Le Griffon* is the sovereign property of the Republic of France as trustee for the people of France, wherever it may be located; (2) until further research on the shipwreck has been conducted, France is not convinced that the Defendant is, in fact, *Le Griffon*; and (3) further research should be conducted under the auspices of the Court and/or the parties to determine whether the defendant is, in fact, *Le Griffon*. The Republic of France has thus asserted its ownership of *Le Griffon* since it first became aware of the possible location of the shipwreck in 2005. Chanoux Affidavit, 2-4-09, ¶ 3.

By way of example, in its July 26, 2005 communication on behalf of France, the U.S. Department of State gave notice of France's claim to *Le Griffon* as a "State vessel." Doc. 51, attachments to Pl Notice of Filing of U.S. State Department Communication, 8-16-05, at p.1 (e-mail of Robert C. Blumberg, Esq.). Repeating several times France's claim that the *Le Griffon* "was a state vessel," the Department of State noted that in acting

2

on behalf of France "[a]s we did in regard to La Belle, the Department of State intends to send all the documents we have received from France to US Government and independent experts and seek their views as to whether the Griffon was a State vessel, as France asserts." *Id.* The Department of State further declared:

> While this expert analysis is in progress, it would seem to us, as well as to France, that a logical next step would be to proceed with identification of the vessel in question. France informs us that the French Ministry of Culture is prepared to send a team of 3 or 4 experts for 8 to 10 days to assist with identification, although the issue of who pays for this team and other modalities remains a question to be resolved.

*Id.*

The State Department's communication not only identified France's claim of ownership of *Le Griffon*, but also conveyed the factual and legal basis for the claim. The July 8, 2005 Memorandum of the French Ministry of Foreign Affairs[2] attached to the communication, sets forth detailed grounds for "recognizing France's rights to the wreck of the *Griffon*." Doc. 51, attachments to Pl Notice of Filing of U.S. State Department Communication, 8-16-05, at p. 3 (Memorandum of Ministère Des Affaires Étrangères, 7-8-05).[3] France's Memorandum detailed at some length the fact that LaSalle's mission of exploration and colonization was not a private action, but instead occurred pursuant to the sovereign decree and function of the King. *Id.*, Doc. 51 at p.3. The Memorandum described how the royal rights granted to La Salle for his mission of constructing Fort Frontenac and other military fortifications demonstrated "the official nature of Cavalier de la Salle's undertakings." *Id.* It discussed why, independent of the nature of his undertakings, the French sovereign is the legal successor to La Salle's estate because La

---

[2] The "Ministère Des Affaires Étrangères."

[3] The Memorandum was attached to the U.S. Department of State's July 26, 2005 communication.

Salle had been granted "*the title of fiefs and the rights of seignoriory and justice.*" (emphasis supplied).  *Id.*, Doc. 51 at p. 4.  France's memorandum further pointed out that "the action undertaken by Cavalier de la Salle and particularly the building of the *Griffon* was part of the agreement closely linking it to the Crown of France and that it was indirectly financed by the Crown of France."  *Id.*  France's Memorandum detailed how the construction of Le *Griffon* was entrusted to "the *Master Shipwright for the King* in the records as well as the building contracts made in the presence of lawyers." *Id.* (emphasis supplied).  The Memorandum further explained how *Le Griffon* has historically been maintained on the official registries of France's royal ships.[4]

Various proceedings ensued, resulting in the District Court's dismissal of Plaintiff's Second Amended Complaint.  Following Great Lakes Exploration's appeal, the U.S. Court of Appeals for the Sixth Circuit reversed and remanded, directing the District Court to proceed with the arrest of the Defendant.

The District Court thereupon issued a "conditional warrant for the arrest" of the Defendant.[5]  Pursuant to the conditional warrant, the U.S. Marshal arrested an artifact from the Defendant.

The Intervenors filed an answer and claim to the complaint.  *See* Interv Answer, 8-22-09.  The answer and claim stated that the Intervenors are "making a restricted

---

[4] Pursuant to Fed. R. Evid. 201(b), the Court should take judicial notice that all of these historical claims are consistent with the expansive claim to sovereignty and power exercised by King Louis XIV as "the Sun King."

[5] At the present stage, it is unnecessary to address the legal effect of a conditional warrant for the arrest of the Defendant under Fed. R. Civ. P. Suppl. R. C, other than to note that Rule C does not provide for a conditional warrant and does not describe the procedures to be followed in the event of the issuance of a conditional warrant.  *See* Fed. R. Civ. P. Suppl. R. C(3)(a).

appearance to defend against Plaintiff's claim against property of the State of Michigan." *See* Interv Answer, 8-22-09, p. 1, *preamble*.

Following their filings, the Intervenors did not move for an order barring claims or otherwise closing the proceedings. Plaintiff Great Lakes Exploration also failed to move for an order barring further claims. As of the date of this Response, no bar order has been entered.

On December 18, 2008, the Plaintiff filed its notice of consent to the filing of a claim and/or answer by the Republic of France. Pl Notice of Consent, 12-18-08. Great Lakes Exploration noted that it had been notified that the Republic of France was in consultation with the U.S. Departments of State and Justice to determine the process for filing an additional claim and/or answer in the proceeding (insofar as consistent with its sovereignty and as appropriate under international and domestic law) in order to supplement the previous notifications provided to the Court by and through the U.S. Department of State regarding the ownership claim that has been asserted by the Republic of France to the *Griffin* shipwreck during the course of the prior proceedings. Great Lakes Exploration further noted that it had no objection to the filing, and that there had been no prejudice or reasonable basis for refusing such a request. .

Intervenors did not object to the Plaintiffs' Consent. Again, neither they, nor the Plaintiff, moved for a bar order. Only after having received notice of the anticipated supplementary claim of France, Intervenors turned around and filed a motion for summary judgment (a little less than a week later, on December 23).

To supplement its earlier communications of its claim of ownership, France filed a claim on January 27, 2009, and an answer on February 10, 2009. The Intervenors filed

their objections to the claim and answer of France several weeks after the filing of the claim.

This matter is now before the Court on the Intervenors' Objection to the answer and claim of France.

## ARGUMENT

I. **THE STATE OF MICHIGAN HAS HAD REPEATED NOTICE OF FRANCE'S CLAIM OF OWNERSHIP OF *LE GRIFFON*.**

The gravamen of the State of Michigan's objection is that it had no notice that France claimed to be the owner of *Le Griffon* prior to the State's filing of its Motion for Summary Judgment. To be candid-- with no offense intended to the Intervenors or their counsel-- this argument is simply disingenuous.

The State of Michigan has been well aware of the claim of France to ownership of *Le Griffon* for at least 3 1/2 years. It has been the consistent position of the Republic of France that it is the owner of *Le Griffon* as a sovereign vessel of the Crown of France, performing sovereign functions at the time of her loss. *See* Affidavit of Michel Chanoux, Secretary General for the Embassy of France, 2-4-09, ¶ 2. As noted above, the Republic of France has asserted its ownership of *Le Griffon* since it first became aware of the possible location of the shipwreck in 2005. Chanoux Affidavit, 2-4-09, ¶ 3.

As further noted above, the U.S. State Department's July 26, 2005 communication on behalf of France left no doubt of France's claim to *Le Griffon* as a "State vessel." Doc. 51, attachments to Pl Notice of Filing of U.S. State Department Communication, 8-16-05, at p.1 (e-mail of Robert C. Blumberg, Esq.). The communication repeated several times France's claim that the *Le Griffon* "was a state vessel. " It noted that the "logical next step would be to proceed with identification of the vessel in question," and that France's

Ministry of Culture "is prepared to send a team of 3 or 4 experts for 8 to 10 days to assist with identification…." *Id.*

As further noted above, the State Department's communication not only identified France's claim of ownership of *Le Griffon*, but also conveyed the factual and legal basis for the claim. The July 8, 2005 Memorandum of the French Ministry of Foreign Affairs describes at length the fact that LaSalle's mission of exploration and colonization was not a private action, but instead pursuant to the sovereign decree and function of the King; that the royal rights granted to La Salle for his mission of constructing Fort Frontenac and other military fortifications demonstrated "the official nature of Cavalier de la Salle's undertakings"; that, independent of the nature of his undertakings, the French sovereign is the legal successor to La Salle's estate because La Salle had been granted titles of nobility; that the construction and financing of *Le Griffon* were part of the agreement closely linking it to, and financed by, the Crown of France; that construction of Le *Griffon* was entrusted to "the *Master Shipwright for the King* in the records as well as the building contracts made in the presence of lawyers"; and that *Le Griffon* has historically been maintained on the registry of royal ships. ." Doc. 51, attachments to Pl Notice of Filing of U.S. State Department Communication, 8-16-05, at pp. 3-4 (Memorandum of Ministère Des Affaires Étrangères, 7-8-05).

The Republic of France has acted in accordance with the established customs and usages of international law regarding the process for sovereign-to-sovereign communications. Chanoux Affidavit, 2-4-09, ¶ 6. As a sovereign nation-state and member of the international legal community, France's actions within the territory of the United States are constrained by the international legal principles of sovereignty and non-

7

interference. In its communications and actions regarding the assertion of its ownership interest in *Le Griffon*, France has sought to fulfill its obligations under the law of nations regarding non-interference. *Id.*

The U.S. Department of State undertook to communicate France's claim of ownership of *Le Griffon* to the Court and the parties. The Department of State indicated to France that it was not appropriate for France to directly participate in the proceedings, and that, on behalf of France, the State Department had given proper notice of France's claim of ownership of *Le Griffon*. Chanoux Affidavit, 2-4-09, ¶ 7-8. After the case was remanded by the Court of Appeals, France filed a further written claim to supplement the previous submissions through the Department of State promptly upon receiving approval of the State Department for directly communicating with the Court. Chanoux Affidavit, 2-4-09, ¶¶ 9- 10.

France has clearly stated its interests. It simply desires to protect the sovereign rights of its people in *Le Griffon*. Chanoux Affidavit, 2-4-09, ¶ 11. As noted in its claim, (1) the Republic of France is the owner of the shipwreck of *Le Griffon*; (2) it has not abandoned its interests in *Le Griffon*; and (3) it maintains its interests in *Le Griffon* as a sovereign vessel of the Crown of France, performing sovereign functions at the time of her loss, including as a vessel of exploration and warship on behalf of the Crown. *Id.*, 12. It does not desire to become embroiled in adversarial or uncivil accusations and counteraccusations among the Plaintiff and the Intervenors.

## II. FRANCE HAS PROCEEDED IN ACCORDANCE WITH THE PRINCIPLES OF INTERNATIONAL LAW OF NON-INTERFERENCE IN THE DOMESTIC AFFAIRS OF THE UNITED STATES.

When France became aware of the possible location of *Le Griffon* in Lake Michigan, it notified the U.S. Department of State of its ownership of the shipwreck. Chanoux Affidavit, 2-4-09, ¶ 4. France's contact with the U.S. Department of State was in conformity with the established customs and practices of nation-states in intercourse with other nation-states in our international community. Historically in its dealings with the United States, France has also customarily communicated through the Executive Branch with the other Branches of the United States Government regarding matters affecting its property ownership and other interests located within the United States. *Id.* The United States, likewise, has customarily communicated with France's Ministry of Foreign Affairs in Paris with regard to matters affecting America's ownership interests located within French territory. *Id.*

In its communications, the Republic of France requested that the U.S. Department of State do all things necessary and proper in compliance with the laws of the United States to assert the claim of the Republic of France as owner of *Le Griffon*. It has continued to do so throughout the instant proceedings. Chanoux Affidavit, 2-4-09, ¶ 5.

This has all been in compliance with the fundamental principle of public international law that a foreign sovereign must go to great lengths to avoid interfering in the domestic affairs of another foreign sovereign. *See* I Brownlie, *Principles of Public International Law*, ch. 13, § 6, p. 284 (2nd ed. 1973). In reflecting this principle, the ministries of foreign affairs and departments of state typically play a key role in

interposing claims of rights, privileges and immunities on behalf of foreign sovereigns. *See* Brownlie, ch.2, § 11, pp. 54-55.

Within the United States, the Departments of State and Justice have had a longstanding practice of affirmatively "suggesting" claims on behalf of foreign sovereigns before the domestic courts of the United States. J. Bellinger, *Treaty Interpretation* (available at http://opiniojuris.org/2007/01/18/immunities). *Id*. This practice dates at least to the mid-1960s, when the Executive Branch made such suggestions with respect to the South Korean Foreign Minister (1963) and King Faisal of Saudi Arabia (1965). The Executive Branch has made suggestions to the Judicial Branch in well over thirty cases involving foreign sovereigns and heads of state. *Id. See, e.g. Kilroy v. Charles Windsor</I, Prince of Wales*, Civ. No. C-78-291 (N.D. Ohio, 1978) (excerpted in 1978 Dig.U.S.Prac.Int'l L. 641-43); *Weixum v. Xilai,* 568 F.Supp.2d 35 (D.D.C. 2008).

It is appropriate, therefore, to take account of the fact that France has acted consistently with the international legal principles of sovereignty and non-interference in the domestic affairs of the United States. "Separation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy." *Spacil v. Crowe*, 489 F.2d 614, 619 (C.A. Canal Zone 1974) (citing *United States v. Lee*, 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171 (1882)). *Accord Ye v. Zemin,* 383 F.3d 620, 626 (7th Cir. 2004) ("Our deference to the Executive Branch is motivated by the caution we believe appropriate of the Judicial Branch when the conduct of foreign affairs is involved.").

### III. PRINCIPLES OF INTERNATIONAL COMITY AND RECIPROCITY WEIGH AGAINST ANY OBJECTION TO THE ANSWER AND CLAIM OF FRANCE.

The principles of comity and reciprocity provide a further important principle of public international law adopted into the law of the United States. *See Hilton v. Guyot*, 159 U.S. 113 (1895). *See generally* Brownlie, ch. 1, § 11, p. 30.ch. 15, § 8, p. 328; *The Paquete Habana*, 175 U.S. 677 (1900). *See, e.g.* Moore, Arbitrations, i. 653 (discussion of the *Alabama* arbitration, reflecting, among other things, French usage of the corresponding concept of *convenance et courtoisie internationale*).

In the present case, it may indeed appear, perhaps, even ironic that the Intervenors would attack the rights of the Republic of France. France has staunchly, repeatedly, and zealously upheld the sovereign rights of the United States to American vessels located in French waters. One can well imagine the reaction of the United States if France had interposed objections to the United States' exercise of its ownership interests in the remnants of the vessels, landing craft and other property carrying our nation's heroes who landed on the beaches of Normandy on D-Day. Time and again, the people of France have shown great respect for the sovereign property rights of the United States located in France.

Most recently, France's staunch support for the rights of the United States to recover the wreck of the Confederate raider *Alabama* provides a classic example of international comity. Although the French navy was the discoverer of the wreck of the CSS *Alabama*, France nonetheless recognized and defended the ownership rights of the United States Government as the successor to the Confederate States of America. France has worked closely with the United States and American not-for-profit organizations in

efforts to recover and raise the shipwreck, resulting in the recovery of over 300 artifacts, including cannon, structural samples, tableware, the ship's bell and numerous other items that reveal much about life aboard the Confederate warship. *See, e.g.* Gordon P. Watts, Jr., "Archaeological Investigation of the Confederate Commerce Raider CSS *Alabama* 2002, *http://www.hnsa.org/conf2004/papers/watts.htm.* The notion that the United States, a nation which views itself as setting an example of the rule of law for the rest of the international community, would enjoy the benefit of such protections while in turn denying reciprocal protection to another nation-- let alone the nation that played the central role in supporting America's war for independence from Great Britain-- is anathema to the core values of our nation's legal system, as the moral principles that are a foundation of the American republic.

> As is also true regarding the revenue rule and the act of state doctrine, separation of powers concerns inform application of the doctrine of international comity: "comity in the international context (in conjunction with separation of powers principles) requires deference to international and executive branch processes and efforts to establish coherent policies on matters of substantial public concern."

*European Community v. RJR Nabisco, Inc.*, 150 F.Supp.2d 456, 474 (E.D.N.Y.,2001) (quoting *767 Third Ave. Assocs. v. Consulate Gen.*, 60 F.Supp.2d 267, 280 (S.D.N.Y.1999), *aff'd in part and vacated in part*, 218 F.3d 152 (2d Cir.2000)).

IV. **THE STATE OF MICHIGAN'S ARGUMENT MISAPPREHENDS THE PROCEDURE FOR ADJUDICATING *IN REM* PROCEEDINGS REGARDING SHIPWRECKS.**

The State of Michigan's argument also overlooks the fact that until specific artifacts are actually recovered from the shipwreck, the admiralty court exercises not actual, but instead "constructive" jurisdiction. *See R.M.S. Titanic, Inc. v. The Wrecked*

*and Abandoned R.M.S. TITANIC*, 286 F.3d. 194, 206 (4th Cir. 2002). The "arrest" in shipwreck cases does not give the plaintiff any rights of ownership or a salvage award to artifacts remaining on the shipwreck. Instead, it simply protects the Plaintiff's already-existing inchoate lien and right to continue its salvage efforts. *See R.M.S. Titanic, Inc.,* 286 F.3d. at 206.[6] After the Court has taken constructive jurisdiction, as artifacts are physically recovered and arrested by the Marshal, parties claiming title to specific items recovered in the future are thus entitled to notice and opportunity to file claims/answers--and to be heard. *See* Fed. R. Civ. P. Supp. R. C.

If and when the Court adjudicates title to specific artifacts or makes a salvage award, an actual, as opposed to constructive, arrest must have been made with respect to such artifacts. *See, e.g. R.M.S. Titanic,* 171 F.3d. at 967. The rules for execution of process and the filing of claims and answers, then come, again, into play.

In the present case, pursuant to the Court's arrest order, only one artifact has been arrested. The Court has specifically restricted the recovery of any further artifacts. Until the Court's permits the parties, whether individually or jointly, to make additional recoveries and to then present those to the Marshal for arrest, France is permitted to assert its claim of title to any and all items that have not yet been recovered.

---

[6] Thus, the Court in shipwreck cases typically issues a warrant for the "arrest" of a physical part of the wreck (an "artifact"), and the salvor brings the item to the U.S. Marshal for execution. Based on this "arrest," the Court exercises constructive jurisdiction over the entire shipwreck. *See, e.g. R.M.S. Titanic, Inc. v. The Wrecked and Abandoned R.M.S. TITANIC*, 171 F.3d. 943, 964 (4th Cir. 1999), *cert. denied*, 528 U.S. 825 (1999). In addition, in the case of intangible property (*e.g.* the salvor's inchoate lien), the "arrest" warrant is executed by leaving a copy of the summons and complaint directing any person having control of the property (*e.g.,* in the case of the salvor's inchoate lien, the salvor) to "show cause why it should not be paid into court to abide the judgment." and the clerk issue such supplemental process as may be required to enforce the Court's order. *See* Fed. R. Civ. P. Supplemental Rule C(3), C(5), For a general description of the mechanics, *see generally* 4 *Benedict On Admiralty* §3.02[D][5].

In short, at the current stage of proceedings, the only item that has been arrested is the artifact in the custody of the U.S. Marshal. Given that no other artifacts have been arrested, the Republic of France is entitled to assert its claim of ownership to all unrecovered items.

V.  **INTERVENORS (1) FAILED TO OBJECT TO PLAINTIFF'S NOTICE OF CONSENT TO FILING OF CLAIM BY FRANCE AND (2) FAILED TO MOVE FOR A SHIPWRECK BAR ORDER.**

As noted above, on December 18, 2008, the Plaintiff filed its notice of consent to the filing of a claim and/or answer by the Republic of France. Pl Not Consent to Filing of Claim and Answer by France, 12-18-08, p. 1. Great Lakes Exploration noted that it had been notified that the Republic of France was in consultation with the U.S. Departments of State and Justice to determine the process for filing an additional claim and/or answer in the proceeding in order to supplement its previous claim of ownership by and through the U.S. Department of State. Great Lakes Exploration further noted that it had no objection to the filing, that there had been no prejudice or other reasonable basis for refusing such a request. .

Intervenors did not object to the Plaintiffs' Consent. They did not move for a bar order. After receiving notice of the anticipated supplementary claim of France, Intervenors turned around and filed a motion for summary judgment, asserting that *Le Griffon* was abandoned.

Typically in shipwreck proceedings, if a party moves for such an order, the District Court will enter a bar order (completely separate from the arrest order) that gives fair notice that after a specified date certain, all further claims will be barred. *See, e.g. Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 301 (4th Cir.

14

2000) ("The order of the district court filed April 3, 1990, which is yet in effect, provides that the proceeding is closed to the filing of additional claims by any person to the *Central America* or any items recovered therefrom, whether such items be recovered prior to the order or subsequent to it, and that all claims after April 3, 1990 are ordered foreclosed.").

In the present case, as noted above, no order closing the proceedings or barring further claims has ever been requested by any party. And no such order has ever been entered.[7]

Finally, as for the Intervenors' argument that France's answer has failed to deny or respond to several paragraphs of the Second Amended Complaint, as noted above, it is doubtful that the Intervenors have any standing to object. In any event, Fed. R. Civ. P. 8(b)(6) plainly states that matter not denied is taken as admitted. If France deems it necessary to file an amended answer, it will do so in due course pursuant to Fed. R. Civ. P. 15(a).

**VI.  IN THE EVENT THAT THE COURT DETERMINES THAT THEY ARE OBJECTIONABLE OR INADEQUATE, IT SHOULD GRANT FRANCE LEAVE TO FILE ITS ANSWER AND CLAIM *NUNC PRO TUNC* OR OTHER APPROPRIATE RELIEF TO ENSURE A FAIR ADJUDICATION OF THE CASE ON ITS MERITS.**

As noted above, no party has sought an order barring further claims in this matter, and the Court has not entered any such order.[8] If the Court nevertheless determines that

---

[7] The Plaintiff has not sought such a bar order because of its concern that until the identity of the *in rem* Defendant has been definitively determined, such an Order would violate due process of law and constitute reversible error. Until the identity of the shipwreck is definitively corroborated, it is possible that not all potential claimants will have received reasonable notice of their potential interests in the Defendant.

15

the answer and claim are otherwise technically objectionable at the current procedural posture, France respectfully moves the Court to permit the filing *nunc pro tunc* or grant other appropriate relief to ensure a fair adjudication of the case on its merits. *See* Fed. R. Civ. P. 6 (b).[9] As discussed below, to the extent that the Court determines that the international practice for filing claims is insufficient, both good cause and excusable neglect exist for filing France's answer and claim of interest.

Traditionally, the courts have not favored defaults.[10] As a result, any doubts as to whether a party is in default have been decided in favor of the party alleged to be in default. *See Thompson v. American Home Assurance Co.*, 95 F.3d 429 (6th Cir. 1996); *Key Bank v. Tablecloth Textile Co.*, 74 F3d 349 (1st Cir. 1996). "The preferred disposition of any case is upon its merits and not by default judgment. As a result, a

---

[8] The Republic of France respectfully submits that, in any event the Intervenors do not have standing to object to a delay in the filing of an answer or statement of interest, since they are not the plaintiff; and have filed no pleading to which a response is required. *See* Fed. R. Civ. P. 55(b) (except where plaintiff's is for a computable sum of money, standing to apply for default lies with the plaintiff). Moreover, in intervening, the Intervenors elected to make a Rule E(8) restricted appearance for the purpose of defending the jurisdiction of the State of Michigan to its bottomlands. *See* Fed. Rule Civ. P. Supp. R. E(8) ((8) ("An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment, may be *expressly restricted to the defense of such claim and in that event is not an appearance for the purposes of any other claim* with respect to which such process is not available or has not been served.." (emphasis added)

[9] Pursuant to W.D. MI Local Civil Rule 7.1(d), counsel for the Republic of France hereby certifies that he unsuccessfully attempted to obtain the concurrence of the parties to the filing of a claim of interest and answer on behalf of France prior to making each of those filings. The Plaintiff consented to the filings; the Intervenors did not.

[10] This public policy is particularly strong with respect to the property rights of sovereigns, whose rights implicate the interests of the millions of people whose interests they represent. *Cf.* Fed. R. Civ. P. 55(d) (no default against the United States unless evidence of the plaintiff shows entitlement to relief).

default judgment must ordinarily be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *See* 21 Fed. Proc. L ED § 51:52, p. 324.

In considering whether to enter a default, the courts have applied a liberal standard for allowing late pleadings, trying wherever possible to see that cases are decided on their merits. *See Wilson v. Winstead*, 84 F.R.D. 218 (E.D. Tenn. 1979); *United States v. Moradi*, 673 F.2d 725 (4th Cir. 1982). *See generally United States v. One 1979 Oldsmobile-Cutlass Supreme*, 589 F.Supp. 477, 478 (N.D.Ga.1984) (reliance on information from a governmental agency justifies relief from filing deadlines); *United States v. 1967 Mooney M20-F Aircraft*, N9588M, 597 F.Supp. 531, 532 (N.D.Ga.1983) (accord); *United States v. Articles of Hazardous Substance,* 444 F.Supp. 1260, 1263 (M.D.N.C.), *modified,* 588 F.2d 39 (4th Cir.1978) (good faith effort to assert claim justifies relief from filing deadlines)

In evaluating whether to enter a default, the Court considers a variety of circumstances, including whether the default is willful and contemptuous; whether the defaulting party appears to have a colorable argument on the merits; whether the issues or money involved in the case are significant; and whether the default was due to excusable neglect. *See generally* 21 Fed. Proc. L ED § 51:57, pp. 326-27. *See also Lawrence v. Chabot,* 182 Fed. Appx. 442, 456 (6th Cir. 2006) ("Under Rule 55(c), a court may set aside an entry of default '[f]or good cause shown.' Although a district court has 'considerable latitude' under the Rule 55(c) standard, the court, in determining whether a defendant has demonstrated good cause, should examine whether '(1) the default was

willful, (2) set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious.'").

Of these factors, the courts give heavy emphasis to whether the alleged default is willful. *See* 21 Fed. Proc. L ED § 51:68, p. 341. *See, e.g., United Coin Meter Co. v. Seaboard Coastline R.R.,* 705 F.2d 839, 845 (6th Cir.1983). A second critical factor is whether the allegedly defaulting party appears to have a colorable defense or claim. *Id.*

In the present case, all the critical factors permitting France's answer and claim of interest. First, as noted above, the Republic of France has not acted willfully. It relied upon the traditional practice of the Executive Branch to take the necessary action to protect its interests. In good faith, it abided by the principle of non-interference in the domestic affairs of the United States. As soon as it received approval from the State Department to file a claim directly with the Court, France proceeded to do so. It has done so out of an abundance of caution so despite the fact that it is not convinced beyond doubt that the Defendant in this case is, in fact, *Le Griffon*.

Second, France has a colorable claim. It is well-established that the property of a sovereign is not abandoned unless the sovereign expressly renounces title. France has not renounced title to *Le Griffon*. It has consistently stated its ownership of the shipwreck of *Le Griffon*.

Third, all the parties have had notice of France's claim of ownership of *Le Griffon* for more than 3-1/2 years. It is simply not credible that any party to this proceeding would assert that it was unaware of France's claim of ownership and non-abandonment. Every party to this proceeding has known for several years that France (1) maintains its

ownership interest in *Le Griffon* and (2) is not yet convinced, without further archaeological analysis of the site, that the Defendant shipwreck is, in fact, *Le Griffon*.

Fourth, the issues in this case are weighty. If the defendant is, in fact, *Le Griffon*, it is a treasure of inestimable cultural value. This is precisely the kind of case where the courts strongly favor a trial on the merits in order to ensure the adversarial presentation of arguments and evidence to protect the interests of all.

Fifth, the alleged default is due to excusable neglect. The Republic of France acted in good faith. It looked to the representation of its interests by the Executive Branch of the United States Government, which is primarily responsible for conducting the foreign relations of the United States. As soon as it received approval from the Executive Branch, France proceeded to file.

## CONCLUSION

Accordingly, the Court should deny the Intervernors' objection, and, alternatively, should grant France leave to file its answer and claim *nunc pro tunc* or other appropriate relief to ensure a fair adjudication of the case on its merits.

Respectfully submitted,
THE REPUBLIC OF FRANCE

/s/ Richard T. Robol
Richard T. Robol (0064345)
ROBOL LAW OFFICE, LLC
433 West Sixth Avenue
Columbus, Ohio  43201
(614) 737-3739
Attorney for the Republic of France

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically and served electronically on all counsel of record via the Court's ECF system this 28th day of March, 2009.

    /s/ Richard T. Robol
    Richard T. Robol